STATE v. LEWIS.

(Filed November 21, 1906).

*Lynching—Statute Split Up in Revisal—Indictment—Venue — Grand Jury—Legislative Power—Motion to Quash—Plea in Abatement.*

1. The force and effect of ch. 461, Laws 1893, in regard to lynching, is not impaired by the fact that it has been split up and the different sections placed under appropriate heads in the Revisal, and its provisions as incorporated in the Revisal fully define the offense intended to be repressed, and designate the punishment and procedure.

2. In an indictment for lynching it was error to quash the bill on the ground that it appeared on the face of the bill that the offense charged was not committed in the county in which the bill was found, but in an adjoining county.

3. Rev., sec. 3233, providing "The Superior Court of any county which adjoins the county in which the crime of lynching shall be committed shall have full and complete jurisdiction over the crime and the offender to the same extent as if the crime had been committed in the bounds of such adjoining county" is a constitutional exercise of legislative power.

4. The Legislature of North Carolina has full legislative power which the people of this State can exercise as completely and fully as the Parliament of England or any other legislative body of a free people, save only as there are restrictions imposed upon the Legislature by the State and Federal Constitutions.

5. A plea in abatement, and not a motion to quash, is the proper remedy for a defective venue.

STATE *v.* LEWIS.

6. It was error to quash a bill of indictment under Rev., sec. 3698, which charged the defendant with conspiring "with others" to commit the crime of lynching, because it did not name the others or charge that they were unknown.

BROWN, J., dissenting.

INDICTMENT against Zeke Lewis, heard by *Judge T. J. Shaw* at the July Special Term, 1906, of the Superior Court of UNION. The defendant was indicted in the following bill:

NORTH CAROLINA—Union County.

Superior Court, July Special Term, 1906.

The jurors for the State upon their oaths present: That Zeke Lewis and others, late of the county of Anson, on the 28th day of May, in the year of our Lord one thousand nine hundred and six, with force and arms, at and in the county aforesaid, unlawfully, wickedly, wilfully and feloniously did conspire together to break and enter the common jail of Anson County, the place of confinement of prisoners charged with crime, for the purpose of lynching, injuring and killing one John V. Johnson, a prisoner confined in said jail, charged with the crime of murder, against the form of the statute in such case made and against the peace and dignity of the State.

And the jurors for the State, upon their oaths aforesaid, do further present: That the said Zeke Lewis afterwards, to-wit, on the day and year aforesaid, with force and arms, at and in the county aforesaid, unlawfully, wilfully and feloniously did engage in breaking and entering the common jail of Anson County, the place of confinement of prisoners charged with crime, with intent to injure, lynch, and kill one John V. Johnson, a prisoner confined in said jail charged with the crime of murder, against the form of the statute in such case made and provided and against the peace and dignity of the State.

STATE *v.* LEWIS.

And the jurors for the State, upon their oaths aforesaid, do further present: That the said Zeke Lewis afterwards, to-wit, on the day and year aforesaid, with force and arms, at and in the county aforesaid, unlawfully, wilfully, wickedly, and feloniously did injure, lynch and kill one John V. Johnson, a prisoner confined in the common jail of Anson County, charged with the crime of murder, against the form of the statute in such case made and provided, and against the peace and dignity of the State.

ROBINSON, *Solicitor.*

The defendant moved to quash the bill "for the reason that it appears upon the face of the bill that the offenses charged were committed, if at all, in Anson County, and there is no warrant or authority of law for finding the indictment or trying him in Union County"; and also to quash the first count in the bill because it charges that "the defendant conspired with others," without naming or charging "and others to the jurors unknown." Both motions were allowed, and the State excepted and appealed.

*Walter Clark, Jr.,* and *R. B. Redwine,* with the *Attorney-General,* for the State.

*J. A. Lockhart, H. H. McLendon* and *F. J. Coxe* for the defendant.

CLARK, C. J. The first statute passed in this State in regard to lynching was ch. 461, Laws 1893. Each provision in that act has been brought forward and incorporated, with very slight verbal changes, under appropriate heads in the Revisal. Sec. 1 of said act, defining lynching and imposing the penalty, is now Revisal, 3698, and is in the chapter on "Crimes," under the subhead Public Justice, and is as follows:

"3698. *Lynching.* If any person shall conspire to break or enter any jail or other place of confinement of prisoners

STATE *v.* LEWIS.

charged with crime or under sentence, for the purpose of killing or otherwise injuring any prisoner confined therein; or if any person shall engage in breaking or entering any such jail or other place of confinement of such prisoners with intent to kill or injure any prisoners, he shall be guilty of a felony, and upon conviction, or upon a plea of guilty, shall be fined not less than five hundred dollars, and imprisoned in the State's Prison or the county jail not less than two nor more than fifteen years." 1893, ch. 461, sec. 1.

Sec. 2 is now Revisal, 3200, and provides that the Solicitor shall prosecute and have the prisoners bound over to the Superior Court of an adjoining county.

Sec 3 is as to witnesses testifying, and is Revisal, 3699.

Sec. 4 of the said Act of 1893 is Revisal, 3233, in the chapter on "Criminal Proceedings," subhead Venue, and reads:

## XI.  VENUE.

"3233.  *Lynching.*  The Superior Court of any county which adjoins the county in which the crime of lynching shall be committed shall have full and complete jurisdiction over the crime and the offender, to the same extent as if the crime had been committed in the bounds of such adjoining county; and whenever the Solicitor of the district has information of the commission of such a crime, it shall be his duty to furnish such information to the grand juries of all adjoining counties to the one in which the crime was committed, from time to time, until the offenders are brought to justice." 1893, ch. 461, sec. 4.

Sec. 5, as to witnesses answering questions, is made Revisal, secs. 3201 and 1638. Secs. 6 and 7 are the same as Revisal, secs. 1288 and 2825. The whole of ch. 461, Laws 1893, is thus in the Revisal, and its force and effect is not impaired by the fact that it has been split up and its different sections placed under appropriate heads. It seems to us that the above

provisions fully define the offense intended to be repressed, and designate the punishment and procedure.   There are many offenses in this chapter on Crimes which, though not common-law offenses, are not defined save by using a term of common knowledge, as "abandonment," "lynching," etc. It is not necessary to prescribe that an act is a misdemeanor or felony.   The punishment affixed determines that.   Revisal, 3291; *State v. Fesperman,* 108 N. C., 772.

It was error to quash the bill on the ground that the offense was not committed in Union County, which is an adjoining county to Anson.   Owing to the prejudice or sympathy which in cases of lynching usually and naturally pervades the county where that offense is committed, the General Assembly, upon grounds of public policy, deemed it wise to transfer the investigation of the charge to the grand jury of an adjoining county.   Without some such provision an indictment could rarely be found in such cases.   We cannot concur with the argument that such provision (Revisal, 3233) is beyond the scope of the law-making power and unconstitutional.

The Legislature of North Carolina has full legislative power, which the people of this State can exercise completely and as freely as the Parliament of England or any other legislative body of a free people, save only as there are restrictions imposed upon the Legislature by the State and Federal Constitutions.   In the very nature of things there is no other power that can impose restrictions.   When the Constitution uses the words "jury" and "grand jury" they are interpreted as being the same bodies, which were known and well recognized when the Constitution was adopted.   But this is a rule of ascertaining the meaning of the words and not a restriction upon the power of the Legislature to make provisions as to venue and the like incidental matters, which in nowise affect the nature and composition of a jury and grand jury. Hence, the qualification of jurors, the number of challenges,

venue, and other similar provisions as to procedure are in the discretion of the Legislature.

The legislative power can be restrained only by constitutional provisions. It cannot be restricted and tied down by reference to the common law or statutory law of England. There is nothing in the common law or statute law of England which is not subject to repeal by our Legislature, unless it has been re-enacted in some constitutional provision.

That the Federal Government is one of granted powers solely, and the State Government is one of granted powers as to the Executive and Judicial Departments, but of full legislative powers except where it is restricted by the State or Federal Constitution, is elementary law. This is nowhere more clearly stated than by Black Const. Laws, secs. 100 and 101, as follows:

"Sec. 100. Under the system of government in the United States the people of each of the States possess the inherent power to make any and all laws for their own governance. But a portion of this plenary legislative power has been surrendered by each of the States to the United States. The remainder is confided by the people of the State, by their Constitution, to their representatives constituting the State Legislature. At the same time they impose, by that instrument, certain restrictions and limitations upon the legislative power thus delegated. But State Constitutions are not to be construed as grants of power (except in the most general sense), but rather as limitations upon the power of the State Legislature.

"Sec. 101. Consequently, the Legislature of a State may lawfully enact any law, of any character, on any subject, unless it is prohibited, in the particular instance, either expressly or by necessary implication, by the Constitution of the United States or by that of the State, or unless it improperly invades the separate province of one of the other departments of the government, and provided that the statute in

question is designed to operate upon subjects within the territorial jurisdiction of the State."

That eminent authority, Cooley Const. Lim. (7 Ed.), 126, says: "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the *full and complete power* as it rests in, and may be exercised by, the *sovereign power* of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is entrusted with the general authority to make laws at discretion." On the next page he further says that "The American Legislatures may exercise the legislative powers which the Parliament of Great Britain wields, except as restrictions are imposed," by some inhibition in the State or Federal Constitution, but the Legislature cannot exercise the judicial and executive functions of the British Parliament, which is supreme. This is a clearcut and very exact statement.

In *State v. Matthews,* 48 N. C., 458, *Judge Pearson* said: "With the exception of the powers surrendered to the United States, each State is absolutely sovereign. With the exception of the restraints imposed by the Constitution of the State and the Bill of Rights, all legislative power is vested in the General Assembly." This is quoted by *Bynum, J.,* with approval, *State v. Railroad,* 73 N. C., 537.

Our Legislature has the same legislative power as the British Parliament, except where some legislative power is expressly denied it by the Constitution of the State or Union, but, unlike Parliament, it cannot exercise judicial or executive functions, and that only because the Constitution has bestowed those functions upon the other two departments. If the State had adopted no Constitution, as was the case in Rhode Island, till 1843, the Legislature would have been su-

preme, as in England, subject only to the Federal Constitution, and there is now, and necessarily can be no limitations upon the Legislature, save those expressly imposed by the State and Federal Constitutions, as Judge Cooley well says. Under the North Carolina Constitution of 1776 the Legislature elected all the executive officers of the State and created and modified at will the judicial department and chose its officers.

The subsequent changes in the State Constitution have put the other two departments upon a more independent footing, but have not added any other limitations upon the legislative power of the General Assembly.

It has long been the statute that in the interest of justice the Court can remove any cause, civil or criminal, to some adjacent county for trial. Revisal, 426-428. If the trial before the petit jury can by legislative authority be transferred to another county, the far less important matter of the venue of the inquiry and finding by the grand jury can also be transferred. In fact, it has often been provided that the grand jury may find a true bill in certain cases where the offense was committed beyond the limits of the county, as will be seen by reference to other sections of the subhead in which Revisal 3233 is found, *i. e.,* 3234: "When any offense is committed on waters dividing counties." 3235: "Where assault is in one county, death in another." 3236: "Assault in this State, death in another." 3238: "Death in this State, mortal wound given elsewhere." 3237: "Person in this State injuring one in another." Also secs. 3403 and 3404 as to embezzlement and conspiracy by railroad officers, confer jurisdiction upon any county through which the railroad passes, and there are still other statutes giving the grand jury jurisdiction to inquire as to offenses committed out of their own county. The Legislature is not likely to increase needlessly the instances in which a grand jury can inquire into offenses committed out of its own county, but of the necessity of such statutes the General Assembly is sole judge.

Up to 1739, indictments for offenses occurring anywhere in North Carolina were cognizable by a grand jury sitting in Chowan County, at Edenton. In that year the venue was changed to New Bern. From 1746 to 1806—for sixty years—indictments were found in district courts, though the grand jury did not sit in the county where the offense was committed, unless that happened to be the county in which the Court was held, and this is the case still with all indictments in the Federal Courts.

If it were possible to hold that the Legislature cannot shape the criminal procedure of this State to provide remedies required by the exigencies of the present time, unless the same remedies had been found to be necessary in England and had occurred to and been adopted by those administering its laws in years long gone by, we find that in fact this same necessity of providing for the investigation by the grand jury of another county had been there provided for as to many offenses. In 4 Bl. Com., 303, we find that while a grand jury could not usually inquire as to offenses committed out of their county, by legislative authority this could be done in very many instances, among others, "Offenses against the Black Act, 9 Geo. I., ch. 22, may be inquired of and tried in any county in England at the option of the prosecutor"; "So felonies in destroying turnpikes, etc. (8 Geo. II. and 13 Geo. III., ch. 84), may be inquired of and tried in any adjacent-county"; and "murders, whether committed in England or foreign parts," may, by virtue of 33 Henry VIII., be inquired of and tried in any shire in England; "any felonies committed in Wales may be indicted in any adjoining county in England." 26 Henry VIII., ch. 6. And there are very many similar statutes there mentioned which were enacted, like the above, long prior to the American Revolution, thus showing that the venue of offenses cognizable before any grand jury is a matter of legislative enactment.

In 1 Stephen History Crim. Law in England, 277, it is
pointed out that there are eighteen exceptions by statute to
the rule requiring an indictment to be found by a grand jury
of the county (the first having been enacted as far back as
2 and 3 Edw. VI.), and he says their very number proves
"that the general principle which requires so many exceptions
is wrong." And on page 278 that distinguished Judge and
author adds: "A rule which requires eighteen statutory ex-
ceptions and such an evasion as the one last-mentioned in the
case of theft—the commonest one—is obviously indefensible.
It is obvious that all courts otherwise competent to try an
offense should be competent to try it, irrespectively of the
place where it was committed, the place of trial being deter-
mined by the convenience of the Court, the witnesses, and the
person accused. Of course, as a general rule, the county where
the offense was committed would be the most convenient
place for the purpose." England has about the same area as
North Carolina, forty counties and a far denser population—
now more than thirty millions. North Carolina has nearly
two and a half times as many counties (97) and about two
millions people. The population of the average English
county is therefore forty times that of an average county in
this State. If, nevertheless, the public interest requires that
even in England the finding of an indictment shall not be
restricted always to a grand jury in the county where an
offense is committed, for a stronger reason the Legislature
here must have power in its judgment to change the venue in
the interest of justice, with our smaller counties and sparse
population.

The venue of a grand jury "is a matter under the control
of the Legislature." *State v. Woodard,* 123 N. C., 710.
*State v. Patterson,* 5 N. C., 443, is put on the express ground
that the statute did not give the grand jury jurisdiction of
an offense committed in an adjacent county, as had been the
case under the previous district system. Besides, if there had

been a defective venue the remedy was by a plea in abatement (which is practically a motion to remove to the proper county) and not a motion to quash. Revisal, 3239; *State v. Carter,* 126 N. C., 1012; *State v. Lytle,* 117 N. C., 801.

It was also error to quash the first count. The indictment is against Lewis, and in charging that he "conspired with others" the bill fully complies with Revisal, 3698, which simply provides that, "If any person shall conspire to break," etc. It was not required to name the others, or to charge that they were unknown. The words "with others" is tautology and mere surplusage. The "con" in the word "conspire" embraces the idea that it is an act done "with" another 'or others. Even if the statute had used the words "with others," it would have been sufficient to recite in the' bill "with others" without charging their names, or that they were unknown. Revisal, 3250; *State v. Hill,* 79 N. C.; 658; *State v. Capps,* 71 N. C., 96..

Reversed.

CONNOR, J. I concur in the opinion of the Court in this case with much hesitation. I do not concur in some of the reasons which are given to sustain it. The Court held, in a well-considered and able opinion by *Mr. Justice Shepherd* in *State v. Barker,* 107 N. C., 913, that, although the term grand jury is not found in our Constitution, the section of the Bill of Rights guaranteeing immunity from criminal prosecutions, except upon "Presentment, Indictment, or Impeachment," must be construed to mean "Indictment by a grand jury," as defined by the common law, citing with approval the language of Judge Cooley in that connection. Const. Lim., 59. It was held, in that case, because, at common law, "the concurrence of twelve jurors was absolutely necessary" to find a bill of indictment, it was equally so in North Carolina, and that the Legislature had no power to dispense with such "absolute necessity." *English v. State,*

31 Fla., 340. If my investigation had led me to the conclusion that the *venue* entered into and was an essential element, in the term "indictment" at common law, at the time of the "separation from the Mother Country," I could not hesitate to declare that, in my opinion, it was not within the power of the Legislature to abrogate the common law in that respect. I cannot concur in the suggestion that such power is vested in the Legislature. The people, with whom alone is political sovereignty, have expressly declared that their governmental agencies must act and move within the orbit assigned to them by the Constitution. There is no place for arbitrary power in our governmental system of checks and balances. I do not sympathize with the suggestion that no part of the common law is imbedded in our Constitution. Speaking of the common law, after noting some of its defects, Judge Cooley wisely says: "But, on the whole, the system was the best foundation on which to erect an enduring structure of civil liberty which the world has ever known. It was the peculiar excellence of the common law of England that it recognized the worth, and sought expressly to protect the rights and privileges of the individual man. Its maxims were those of a sturdy and independent race, accustomed, in an unusual degree, to freedom of thought and action, and to a share in the administration of public affairs, and arbitrary power and uncontrolled authority were not recognized in its principles, * * * and, if the criminal code was harsh, it, at least, escaped the inquisitorial features which were apparent in the criminal procedure of other civilized countries, and which have been ever fruitful of injustice, oppression and terror." That those who came to this colony and "builded" our institutions well knew and jealously guarded these great principles, every page of our early history illustrates. The language of Judge Cooley applies with special force to them. "From the first, the colonists in America claimed the benefit and protection of the common law. In some particulars,

however, the common law, as then existing in England, was not suited to their condition and circumstances in the new country, and those particulars they omitted as it was put in practice by them.   *   *   *   Did Parliament order offenders against the laws in America to be sent to England for trial, every American was roused to indignation and protested against the trampling under foot of that time-honored principle, that trials for crime must be by a jury of the vicinage." When the courts in this and other States have been called upon to approve departures from common-law principles and procedure, in criminal trials, they have steadily refused to do so. In *State v. Branch,* 68 N. C., 186, it was shown that a Judge on the circuit had directed the witnesses to be examined by the grand jury in open court. *Chief Justice Pearson,* sustaining a motion to quash the bill for that reason, said: "This procedure is opposed to the principles of the common law, which means 'common sense.' " He further says: "There is not the slightest reason to believe that the practice of examining witnesses before a grand jury in public was ever in force and in use in the colony of North Carolina; very certainly such has not been the practice in the State of North Carolina, and it must be rejected as inconsistent with the genius of a republican government." In *Lewis v. Comrs.,* 74 N. C., 194, *Bynum, J.,* in a very strong opinion, denying the right of a Solicitor to be present when the grand jury are discharging its duties, finds authority for the decision in the common law. After noticing the English practice, as described by Blackstone and others, he says: "It is more consonant to justice and the principles of personal liberty. The powers of the grand jury, therefore, should not be extended further beyond these conservative and salutary principles than is clearly warranted by public necessity and the most approved precedents." In *State v. Miller,* 18 N. C., 500, while the Judges differed in respect to the law, both the *Chief Justice* and *Judge Gaston*

concurred that in considering questions pertaining to the rights of the accused, in trial by jury, recourse must be had to the ancient common law. The same is true in every case where the question has come into debate and the citizen has asserted his rights in respect to the manner in which he could be called to answer, and put upon trial, for a criminal offense. *Millingan, ex-parte,* 71 U. S., 2. In *Byrd v. State,* 1 How. (Miss.), 176, *Sharkey, C. J.,* said: "The right of trial by jury, being of the highest importance to the citizen, and essential to liberty, was not left to the uncertain fate of legislation, but was secured by the Constitution of this and all other States as sacred and inviolable. The question naturally arises, How was it adopted by the Constitution? That instrument is silent as to the number and qualifications of jurors; we must, therefore, call in to our aid the common law for the purpose of ascertaining what was meant by the term 'jury.' It is a rule that when a statute or the Constitution contain terms used in the common law without defining particularly what is meant, then the rules of the common law must be applied in the explanation." *The Opinion of the Judges,* 41 N. H., 550, strongly states the law in this respect. *Brucker v. State,* 16 Wis., 356; *People v. Powell* (Cal.), 11 L. R. A., 75. I agree, of course, that there is much of the common law which is in force in this State by virtue of the Revisal 1905, ch. 15, sec. 932, which is but the re-enactment of the Acts of 1715 and 1778, and, as to this, the Legislature may, as it has in many instances done, repeal or modify it.

In respect to those elementary principles and provisions upon which the security of life, liberty and property depend, guaranteed by Magna Charta, which was engrafted either in express terms or by necessary implication into our Bill of Rights, I do not concede that the power exists, in either department of the government, to abrogate or modify them. To do this is among "the reserved rights" to be exercised only by the people themselves, in convention. This is one of

"the powers not delegated" to the legislative department of the government. I cannot, therefore, assent to the proposition, sometimes found in judicial opinions, that the Legislature has all of the ·powers of the British Parliament, except when expressly restricted. In the discussion of this very important and delicate question, Judge Cooley says: "But to guard against being misled by a comparison between the two, we must bear in mind the important distinction  *   *   * that with the Parliament rests, practically, the sovereignty of the country, so that it may exercise all the powers of the government, if it will do so; while, on the other hand, the Legislatures of the American States are not the sovereign authority, and though vested with the exercise of one branch of the sovereignty, they are nevertheless, in wielding it, hedged in on all sides by important limitations, some of which are imposed in express terms, and *others by implications which are equally imperative.*" Const. Lim., 105. He further says: "So long as the Parliament is recognized as rightfully exercising the sovereign authority of the country, it is evident that the resemblance between it and American Legislatures, in regard to their ultimate powers, cannot be traced very far. The American Legislatures only exercise a certain portion of the sovereign power. The *sovereignty* is in the people; and the Legislatures which they have created are only to discharge a trust of which they have been made a depository, but which has been placed in their hands with well-defined restrictions." This, I think, the sound view. *Nichols v. McKee,* 68 N. C., 430.

The difficulty which I have experienced in arriving at a conclusion in this case is to fix the line at which the Legislature may change or abrogate the procedure, venue, etc., in regard to indictments as they were by the common law recognized and administered by the courts in England. That it may not lessen the number required to concur in finding a bill or permit witnesses to be examined before the grand jury

in public or to permit the prosecuting officer to remain with the grand jury while in session, is settled upon the ground that such things were not permissible by the common law. The only decided case which was cited by counsel, or I have been able to find in this country, in point, is *Swart v. Kimball*, 43 Mich., 443. There, the statute provided that for cutting timber on the public lands the person charged could be proceeded against in the county where the offense was committed or such other county as the Attorney-General should direct. The defendant in error was prosecuted, under the act, in a county other than that in which the offense was committed. He was arrested upon a *capias* and upon *habeas corpus* was discharged. He brought the action against plaintiff in error who procured the information and arrest and recovered judgment for false imprisonment. Several irregularities in the proceedings were alleged.

In regard to the validity of the statute authorizing the change of venue, *Cooley, J.,* said that the act was "manifestly in conflict with one of the plainest and most important provisions of the Constitution." Now, that in jury trials it is implied that the trial shall be by jury of the vicinage, is familiar law.

Blackstone says the jurors must be of the *visne* or neighborhood; which is interpreted to be of the county. 4 Black. Com., 350. This is an old rule of the common law, citing Hawk P. C., b., 2 c., 40; 2 Hale P. C., 264. He refers to certain statutory changes made by Parliament prior to the separation of the colonies, saying: "But it is well known that the existence of such statutes, with the threat to enforce them, was one of the grievances which led to the separation of the American Colonies from the British Empire. If they were forbidden by the unwritten Constitution of England, they are certainly unauthorized by the written constitutions of the American States, in which the utmost pains have been

taken to preserve all the securities of individual liberty. * * * But no one doubts that the right to a trial by jury of the vicinage is as complete and certain now as it ever was; and that, in America, it is indefeasible." After pointing out in strong language the injustice and oppression to which the citizen may be subjected, if compelled to answer an indictment in a county otherwise than that in which the offense was alleged to have been committed, he concludes: "We have not the slightest hesitation in declaring that the act, so far as it undertakes to authorize a trial in some other county than that of the alleged offense, is oppressive, unwarranted by the Constitution and utterly void."

I find a number of cases, cited by counsel, denying the right of the State to remove a criminal trial from the county of the alleged offense for local prejudice. It is so held in a strong opinion by the Supreme Court of California, *People v. Powell, supra.* Judge Cooley says: "But this may be pressing the principle too far." It was so held in *Kirk v. State,* 41 Tenn., 344, and *Osborne v. State,* 24 Ark., 629. But in both these States the Constitution expressly guaranteed a trial in the county in which the offense was alleged to have been committed.

I have carefully examined the history of parliamentary legislation in England on the subject for the purpose of learning how far the venue in criminal proceedings has been regarded in that country, as fixed by Magna Charta. Fitz James Stephens in the "History of the Criminal Law," vol. 1, 274, gives an interesting account of the statutory changes made in the law in regard to venue. Some of them are pointed out in the opinion of the *Chief Justice.* See, also, Mews' Fisher's Com. Law Dig., vol. 2, 2263.

In *Brucker v. State, supra, Dixon, C. J.,* discussing the right of the Legislature to provide that seventeen persons might compose the grand jury, said: "The foundation of the objection is, that this was the rule at common law (that

the grand jury should consist of not more than twenty-three
or less than twelve) recognized by the Constitution, against
which the Legislature had no° power to provide. Upon an
examination of the authorities, we find no such fixed common-
law principle. The only inflexible rule, with-respect to num-
bers, seems to have been that there could not be less than
twelve nor more than twenty-three. The concurrence of
twelve was necessary to find a bill, and there could not be
more than twenty-three, in order that twelve might form a
majority. * * * We are of the opinion, therefore, that
it is competent for the Legislature, within the limits pre-
scribed· by the common law, to increase or diminish the num-
ber of grand jurors to be drawn and· returned without
infringing the rights of the accused granted by the Constitu-
tion." In *Byrd v. State, supra, Sharkey, C. J.*, discussing
the subject, says: "The Legislature cannot abolish or change
substantially the panel or jury, but it may, it is presumed,
prescribe the qualifications of the individuals composing it."

I have noted these cases to show that it is held by courts
adhering to the principle that the guarantee of immunity
from criminal prosecutions, otherwise than by indictment,
that the Legislature may change the law in particulars *non-
essential*, such as qualification of jurors, etc., but in regard to
essentials, such as number, etc., the constitutional provisions
must be read and construed in the light of the common law,
and are not subject to legislative change.

In the absence of express legislative enactment, there can
be no question that the *venue* is the county in which the
offense is alleged to have been committed. I incline to the
opinion, at least to the extent of surrendering my doubts to
the judgment of the majority of the Court, that the act is not
violative of the right of the defendant. In doing so, I am
also influenced by the wise and salutary principle so fre-
quently announced by the greatest Judges who have sat upon
the State and Federal benches, that every presumption should

be made to support the constitutionality of a statute. While I am by no means certain that the beneficial results anticipated by the Legislature will be realized, I sympathize so strongly with the desire and purpose to provide all possible means for detecting and, after trial and conviction, punishing those engaged in the crime of lynching, hoping to suppress it, that I am the more willing to surrender my doubts to its best judgment. It is the first time in our history that the question has been presented, because it was not until the Act of 1893 that the grand jury of any other county than that of the offense was given power to find a bill of indictment.

It would seem that in England it has been deemed necessary to change the venue and permit indictments to be found in counties other than those in which the offense was committed. For many years the statute permitting the Court, upon motion of the Solicitor, supported by affidavits, to remove a criminal case for trial to an adjoining county on account of local feeling, has been invoked without question. While the right to remove, after a judicial determination that a fair trial could not be had in the county of the offense, might be distinguished from the right to indict and try in the county of the Solicitor's selection, I concede that the recognition of the validity of the removal statutes weighs in my mind in favor of the Act of 1893.

I have felt impelled to say this much, because of the importance of the subject and a desire to proceed with the utmost caution in experimental legislation of this kind. While it is not for the judiciary to trench upon the domain of the Legislature, I trust that I may, without impropriety, express the hope that the occasion and condition which, in its judgment, called for this act, may soon pass away; and that we may return to the common-law way of securing to every man immunity from being called to answer for violation of the law otherwise than by indictment preferred by a grand

jury summoned from the county where the crime is supposed to have been committed. Cooley, 392; Story Const., sec. 1769. In addition to the humane policy which protected a man in his hour of trial from being carried away from his home, deprived of the opportunity to have his witnesses, and the benefit of such reputation and character as he had made among his neighbors, this ancient way placed upon the people of each county or neighborhood the responsibility for securing a fair, firm, and just administration of the law, detection and punishment of the guilty and protection of the innocent. How far removing from the people of each county this stimulus and by carrying their citizens into adjoining counties for trial, will promote the end desired, is not clear to my mind.

These are questions, however, committed to the wisdom of the Legislature. I disclaim any right to question the constitutionality of an act of the Legislature because it does not accord with my judgment. This would be to move out of the orbit assigned to the Judge. Judges must not be wiser than the law, but be content to construe and declare it in the light of principle, precedent and constitutional limitations.

WALKER, J. I concur in the result reached in this case and in the opinion of the *Chief Justice,* except in so far as it is therein impliedly stated that the powers reserved in the Constitution by the people may be exercised by their representatives in the General Assembly. My opinion is that the Legislature has only the powers delegated to it by the people, and all powers not so given are reserved to the people themselves, just as by the ninth and tenth articles of amendment to the Constitution of the general government it is provided that the enumeration of certain rights shall not be construed to deny or disparage others retained by the people, but the powers not delegated to the United States by that instrument, or prohibited by it to the States, are reserved to

the States respectively, or to the people. The Constitution is a grant of specific powers and not a restriction upon powers granted, which, but for that restriction, would be general and plenary in their nature. The powers granted are to be exercised only as prescribed, and those of a legislative character by the General Assembly, but all not specially granted remain with the people to be afterwards granted or withheld by them as they may deem best for the public welfare. In this respect, the language of the Constitution of this State is substantially like that of the Constitution of the United States, so far as they both confer power upon the three departments of government, and for this reason they should receive practically the same construction. The legislative power under neither is unlimited, except as it may be said that it is not to be restricted so long as the Legislature moves within its legitimate orbit. The words of Art. I, sec. 37, it seems to me, could have no force under any other construction. As we must ultimately construe that instrument and say what it means, we should be exceedingly careful to see that no power is taken from the people that they have not given in their Constitution, but confine each of the departments and every agency of government to the particular sphere of action assigned to it.

I do not care to enter upon a discussion of the question whether the Legislature had the power to pass the act under which the indictment was found in this case and thereby to authorize the laying of the venue in Union County. Such power existed, in my opinion, and I am content to rest my assent to the conclusion of the Court upon the reasoning and the authorities, as contained in the opinions of the *Chief Justice* and *Mr. Justice Connor*. This power should be confined within reasonable limits, and the Court should see that it is not exercised to the oppression of the citizen or in such manner as to seriously imperil his natural rights. There is no such case presented here. My only purpose in giving

expression to my views at all, is that I may refer to a matter which is not discussed in the opinion of the Court.

It is suggested that the Act of 1893, ch. 461, as brought forward in the Revisal, secs. 3233 and 3698, does not cover this case, as sec. 3698 does not define the crime of lynching, and no statute can be found that creates such an offense. It is therefore argued from that premise, and I think errone-ously, that as sec. 3233 confers jurisdiction upon the Court of any county adjoining that in which the crime is committed only in those cases where the offense charged is "lynching," it follows that the section is nugatory—a dead letter on the statute-book. It will be strange indeed if the Legislature had made so great a mistake, but I do not think it has. The first count of the indictment charges that the defendant con-spired with others to break and enter the jail of Anson County for the purpose of lynching, injuring and killing John V. Johnson, a prisoner confined therein, and charged with the crime of murder; the second, that he actually did break and enter the jail for the same purpose, and the third, that, after so entering, he did lynch, injure and kill the said prisoner; and all the counts in the bill conclude against the statute and also at common law. When we examine the Revisal, we find several sections relating to the crimes charged in the bill, namely, secs. 1288, 2825, 3200, 3201, 3233 and 3698. The first (sec. 1288) relates to the costs incurred in the prosecution of persons conspiring to break and enter or for breaking and entering a jail for the purpose of killing or injuring a prisoner therein confined; the second (sec. 2825), to the duty of the Sheriff to guard the jail and protect pris-oners against persons who may threaten to break and enter it for the purpose aforesaid, and prescribes how he shall pro-ceed; the third (sec. 3200), to the duty of the Solicitor, and provides that he shall cause immediate investigation to be made before a Judge, or other proper officer, who shall bind the person found to be probably guilty to the ensuing term

of the Superior Court of some adjoining county or commit him to the jail of said county; the fourth (sec. 3201), to the testimony of witnesses, requiring all persons to give evidence in such cases, but pardoning those who participated in the crime; the fifth (sec. 3233) confers full and complete jurisdiction upon the Court of any adjoining county to indict and try offenders against the statute; the sixth (sec. 3698) makes it a felony to conspire to break or enter a jail or other place of confinement of prisoners charged with crime or under sentence, for the purpose of killing or injuring any prisoner so confined, or to engage in breaking or entering any jail or like place with intent to kill or injure any prisoner therein confined, and fixes the punishment.

These sections were all taken from the Acts of 1893, ch. 461, but they are not arranged consecutively in the Revisal, nor in the order in which they appear in said acts, but the sections are severally assigned to their appropriate titles or chapters in the Revisal. All of the sections except those numbered 2825 and 3698 have special reference to the crime of lynching, but there is no offense created by law and known or designated by that name, and when, therefore, secs. 3200 and 3233 require that persons guilty of that crime shall be bound to the Superior Court of an adjoining county and indicted and tried in that county, we are unable to know what the Legislature means, unless we refer to the original act, which makes everything plain. We are at liberty to make this reference because the statute will otherwise be incapable of any intelligent construction. It is not only obscurely worded and of doubtful import, but it can have no meaning at all; whereas, it plainly appears that it was intended to have some meaning and to secure the detection and prosecution of a very dangerous class of offenders. Shall we close our eyes to the only source from which we can secure light and by which the meaning and intent will be made manifest and thus defeat the legislative will, or shall we

turn the light on that we may see and know what was meant? The law in such a case, I think, permits and, indeed, enjoins that the latter course should be taken. *United States v. Lacher,* 134 U. S., 624; *The Conqueror,* 166 U. S., at 122.

It is a general rule in the construction of statutes that when a provision of a Revision or a Code is plain and unambiguous the Court cannot refer to the original statute for the purpose of ascertaining its meaning; but if it is of doubtful import, or, without such reference, the provision is meaningless, it is proper to resort to the prior act which had been codified or revised, for the purpose of solving the ambiguity; and especially should this be the rule where the provision is so worded as to be incapable of a fair construction without considering the original statute. Endlich Int. Statutes, secs. 50 and 51; Black Int. of Laws, sec. 136, pp. 365, 366, 367; Lewis Suth. Stat. Const. (2 Ed.), secs. 450-453 and 271. "But if it were conceded that the statute be somewhat ambiguous, we are authorized to refer to the original statutes from which the section was taken, and to ascertain from their language and context to what class of cases the provision was intended to apply." *The Conqueror, supra; United States v. Lacher, supra.*

If the headings or marginal notes of the different sections of the Revisal cannot be used to explain their meaning, then the introduction of the words, "the crime of lynching," into sec. 3233 renders it not only ambiguous, but insensible, as there is then no such crime created by the law, and there was no crime known by that name at the common law; and in that event we are clearly permitted by all the authorities to look at the original statute, although it may have been repealed by the Revisal, in order to ascertain what particular crime the Legislature intended to describe when it used those words.

When the original statute, Acts 1893, ch. 461, is examined we find that sec. 4 of that act, which corresponds with sec.

3233 of the Revisal, refers to sec. 1, which is sec. 3698 of the Revisal; so it appears from this comparison that the words, "the crime of lynching," were used by the revisers as a convenient form of expression in view of the fact that they had placed headings, titles or marginal references to each section, indicating what was meant by the term "lynching," under express authority given to them by the Act of 1903, ch. 314, which provided for a compilation and revision of the statutes of the State and by which commissioners were appointed for that purpose. This being so, sec. 3233 should be held to refer to sec. 3698; and this is also true of sec. 3200 and the other sections above enumerated, as they all were taken from the same act, and by the same rule of construction are to be taken as referring to each other.

When these several sections of the Revisal are thus considered, we find that the Superior Court of the county of Union had jurisdiction to indict through a grand jury in that court, and the power to hear, try and determine the indictment when found, at least so far as the two offenses mentioned in sec. 3698 are concerned; and these are the two offenses described in the first two counts of the bill.

The same result may be reached by applying to the Revisal another rule of construction. It is generally held that the title of an act is a part of the same, but not in the sense that it can be used to construe it, unless the meaning of the act is ambiguous, in which case we may consider it for the purpose of ascertaining the true meaning. *State v. Patterson,* 134 N. C., 612. But this rule does not apply to revisions of statutes where the revisers have been authorized to insert marginal references to the original statutes and to distribute the statutes under appropriate titles, divisions and subjects, as was done by the Act of 1903, ch. 314, sec. 1. Endlich Int. of Stat., secs. 51 and 69; Bishop Written Laws, sec. 46; for, as the eminent writer last mentioned says, such headings and the like in revisions and codes are deemed to be of some-

what greater effect than the ordinary titles to legislative acts, and to indicate at least the nature of the enactment. If this rule is applied, we find that the intent that sec. 3233 should refer to the jurisdiction of offenses described in sec. 3698 is made perfectly clear and manifest. As to the right to construe the several sections with reference to each other, see *Fortune v. Commissioners,* 140 N. C., 322.

My conclusion is that the indictment sufficiently charges the commission of an offense made criminal by sec. 3698, and that secs. 3200 and 3233 refer to the crimes described in that section when they authorize the indictment to be found and the trial to be had in an adjoining county. This makes it unnecessary to inquire whether the indictment is otherwise sufficient to show jurisdiction in the Court, under secs. 3200 and 3233, or, to speak more generally, whether the jurisdiction of the Court can be sustained on other grounds.

As there is at least one offense, if not more than one, charged in the bill of which the Court has jurisdiction, the motion to quash should be denied and the defendant required to plead to the indictment.

BROWN, J., dissenting: I concur in so much of the opinion of the Court as upholds the power of the General Assembly generally to provide for the removal of criminal actions to an *adjoining county,* either before bill found or after. I know of no clause of our Constitution, Federal or State, which prohibits it. Assuming that the jurors must be summoned from the "vicinage," as at common law, I think an adjoining county might well be held to be within the "neighborhood," for that is what the term signifies, although in England, where the counties are very large, it is held to be a jury from the county. I would hesitate to hold that the Legislature has the power to enact that one who commits a crime in Cherokee may be indicted and tried in Currituck. My convictions, however, compel me to dissent, upon other grounds,

from the judgment of my brethren that the grand jurors of Union County had jurisdiction over the offense charged in the bill of indictment. The Act of 1893, ch. 461, together with its title, was as effectually effaced and blotted out from the statute-law of the State by the Revisal of 1905 as if it had never been enacted. Revisal, sec. 5453. Therefore, at the time of the commission of the alleged offense and the finding of the bill, the only statute law which, it is contended, gives jurisdiction to the grand jurors of Union County, is sec. 3233 of the Revisal. The bill alleges that the offenses therein charged were committed in Anson County. A plea in abatement is not, therefore, necessary. This Court can see on the face of the bill that the Superior Court of Union had no jurisdiction, unless the statute confers it. It is familiar learning that a motion to quash may be made at any time where it is apparent upon the face of the record that the Court was without jurisdiction.

The bill of indictment is drawn under sec. 3698 of the Revisal, which is copied in the opinion of the Court. The first count charges, a conspiracy to break into the common jail of Anson County, entered into within said county, and the second charges the actual breaking into said jail. The third count charges no offense, either against common law or statute.

In order to give the Superior Court of Union County jurisdiction under the terms of sec. 3233 it must plainly appear that sec. 3698. creates an offense and defines it as "lynching," for sec. 3233 confines the exercise of jurisdiction by the Superior Court of the adjoining county to the "crime of lynching," and to that alone. Now, does sec. 3698 create and define in terms a crime known as lynching? That is the *crux* of this case. Being a criminal statute, it must be construed strictly, as the sacred right of the liberty of the citizen forbids a liberal construction and a reading into the statute of words that are not there. The word "lynching" is nowhere used in

the body of the statute, and no such distinct offense is named and created by it. Had the statute, sec. 3698, declared in express terms that the acts therein denounced shall constitute the "crime of lynching," or that any person committing such acts "shall be guilty of lynching," I should say the Superior Court of Union County had jurisdiction under sec. 3233. But the body of the statute fails to so declare. It is attempted, however, to "piece out" the statute by bringing in a so-called title. It must be admitted that the title to the Act of 1893 cannot be looked to, for that is as dead as the body of the act, as I have shown. The only title that can be looked to is the one word "Lynching," which is printed in large letters between the number and the body of sec. 3698. If that can be called a title, then, according to the authorities, it does not help the contention of the State. It has been established in England since Lord Coke's time, by an unbroken line of judicial decisions, that the title of a statute is not a part of it, and is, therefore, excluded from consideration in construing it. Endlich on Statutes, 73; *Powell's case,* 11 Rep., 336. In this country, while the title of a statute, in the absence of a constitutional provision, is not regarded as a part of the statute, it is legitimate to resort to it as an aid in ascertaining the meaning of the statute, but only when the language and provisions in the body of the act are ambiguous and of doubtful meaning. Endlich on Statutes, p. 74, and cases cited. Such is the ruling of this Court. *Hines v. Railroad,* 95 N. C., 434.

In *State v. Patterson,* 134 N. C., 612, *Clark, C. J.,* says: "The caption of an act was not at all considered to any extent whatever in construing it, for reasons given in *State v. Woolard,* 119 N. C., 779, but the modern doctrine is that when the language of the statute is ambiguous, the courts can resort to the title as aid in giving such act its true meaning, but that this cannot be done when the language used is clear and unambiguous." The statute construed in that case was,

like the one under consideration, free from ambiguity, but in conflict with its title. The title was disregarded and the body of the statute followed. The title of a statute cannot control or vary the meaning of the enacting part, if the latter is plain and unambiguous, as the statute in the present case is, nor can the title be used for the purpose of adding to the statute or extending or restraining any of its provisions. Black on Interpretation of Laws, p. 173. "Cases which are clearly not within the contemplation of the enacting clause cannot be brought into it merely because the title appears to include them." *Ibid.*, p. 173.

"Lynching" is a word of much more general and extended meaning and significance than any words contained in the body of sec. 3698, and being a penal statute especially the term ought not to be read into it. Black, p. 173; *United States v. Briggs,* 9 Howard, 351. There is no such crime as lynching known to our law, and if the body of this statute does not create it, then it does not exist. The word in its well-known significance and generally accepted meaning embraces many illegal acts which do not come within the purview of this statute, and does not embrace those mentioned in it. The acts made illegal by it constituted indictable offenses before its enactment, and, were it repealed, would still be indictable in the counties where committed.

While no statute of this State defines what is lynching, the lexicographers and historians have given it a well-defined and perfectly understood meaning, which excludes any of the crimes denounced in the act. The great Scotch novelist refers to a species of lynching when he refers to what was called Jedwood justice—"hang in haste and try at leisure." Again, the same versatile author, in his introduction to the Border Minstrelsy, speaks of a sort of lynching called "Lydford Law," quoted by *Mr. Justice Connor* in *Daniels v. Homer,* 139 N. C., 239. A most interesting writer in the American Law Register, Mr. John Marshall Gest, says that "the

Lynch law of our country has a very ancient and respectable pedigree." He refers to the Vehmic tribunals, originating in Westphalia, which executed thieves and murderers, caught in the act, without trial or delay, and speaks of them as "Judge Lynch's cousin German."

The word "lynching" has been defined by legal as well as other lexicographers, and according to such definitions, and as the term is generally understood, the illegal acts commonly termed "lynching" cannot be committed by a single individual; yet one person alone could be guilty of the crime of breaking and entering a jail with intent to kill, under this statute. "Lynching" is defined by Rapalje & Lawrence as "Mob vengeance upon a person suspected of crime." Law Dictionary, 778. It is "a term descriptive of the action of unofficial persons, organized bands, or mobs, who seize persons charged with or suspected of crimes, or take them out of the custody of the law, and inflict summary punishment on them, without legal trial, and without warrant or authority of law." Black's Law Dictionary, p. 737. "A common phrase used to express the vengeance of a mob inflicting injury and committing an outrage upon a person suspected of some crime." Bouvier's Law Dictionary, 287. See, also, *State v. Aler,* 39 W. Va., 558.

Worcester and Webster define the word as the infliction of punishment without legal trial by a mob or by unauthorized persons. The word derives its origin, according to Worcester, from a Virginia farmer named Lynch, who, having caught a thief, instead of delivering him to the officers of the law, tied him to a tree and flogged him with his own hands. Lynching has no technical legal meaning. It is merely a descriptive phrase used to signify the lawless acts of persons who violate established law at the time they commit the acts, and is universally understood to signify the illegal infliction of punishment by a combination of persons for an alleged crime.

As I have said before, the offense of lynching was not known to the common law, and is unknown to the laws of North Carolina, because we have no statute creating and defining the offense. We are, therefore, in the anomalous situation of having a statute fixing the venue for the trial of persons charged with lynching, and yet there is no such crime known to our law, or created by the act. The statute not only fails to declare that the acts therein set out shall constitute the crime of lynching, but those acts do not come within any known definition of the term, as I think I have plainly shown.

A conspiracy to break or enter a jail for the purpose of killing a prisoner has never yet been called "lynching." Neither has the breaking into jail with the intent to kill or injure a prisoner been so denominated. Such acts were recognized indictable offenses before the passage of the act, and are now indictable independent of it. But nowhere have they ever been termed "lynching." This phrase, by common usage, is applied only when the unlawful act is consummated and the illegal punishment actually inflicted. It is plain to me that the so-called title not only is no aid to a proper construction of the act, but the title, tested by every known definition of it, bears no relation to and does not embrace the crimes set out in the act. There is nothing in the statute open to construction. Its words are as simple and unambiguous as any that could have been used, and their meaning free from doubt. It is not "construing" that the statute needs, but amendment. That is what, with all deference, in my opinion, this Court has done to it.

For the reasons given, I do not think that sec. 3233 of the Revisal can reasonably be held to give to the Superior Court of Union County jurisdiction over persons charged with offenses committed in Anson County and indicted in Union under sec. 3698. I am of opinion that his Honor, *Judge Shaw,* was correct in quashing the bill.