BROWN, J., dissenting.
NORTH CAROLINA — Union County. Superior Court, July Special Term, 1906.
The jurors for the State upon their oaths present: That Zeke Lewis and others, late of the county of Anson, on the 28th day of May, in the year of our Lord one thousand nine hundred and six, with force and arms, at and in the county aforesaid, unlawfully, wickedly, wilfully and feloniously did conspire together to break and enter the common jail of Anson County, the place of confinement of prisoners charged with crime, for the purpose of lynching, injuring and killing one John v. Johnson, a prisoner confined in said jail, charged with the crime of murder, against the form of the statute in such case made and against the peace and dignity of the State.
And the jurors for the State, upon their oaths aforesaid, do further present: That the said Zeke Lewis afterwards, to-wit, on the day and year aforesaid, with force and arms, at and in the county aforesaid, unlawfully, wilfully and feloniously did engage in breaking and entering the common jail of Anson County, the place of confinement of prisoners charged with crime, with intent to injure, lynch, and kill one John v. Johnson, a prisoner confined in said jail charged with the crime of murder, against the form of the statute in such case made and provided and against the peace and dignity of the State.
And the jurors for the State, upon their oaths aforesaid, do further present: That the said Zeke Lewis afterwards, to-wit (628) on the day and year aforesaid, with force and arms, at and in the county aforesaid, unlawfully, wilfully, wickedly, and feloniously did injure, lynch and kill one John v. Johnson, a prisoner confined in the common jail of Anson County, charged with the crime of murder, against the form of the statute in such case made and provided, and against the peace and dignity of the State.
ROBINSON, Solicitor.
The defendant moved to quash the bill "for the reason that it appears upon the face of the bill that the offenses charged were committed, if at all, in Anson County, and there is no warrant or authority of law for finding the indictment or trying him in Union County;" and also to quash the first count in the bill because it charges that "the defendant conspired with others," without naming or charging "and others *Page 494 
to the jurors unknown." Both motions were allowed, and the State excepted and appealed.
C. The first statute passed in this State in regard to lynching was ch. 461, Laws 1893. Each provision in that act has been brought forward and incorporated, with very slight verbal changes, under appropriate heads in the Revisal. Sec. 1 of said act, defining lynching and imposing the penalty, is now Rev., 3698, and is in the chapter on "Crimes," under the subhead Public Justice, and is as follows:
"3698. Lynching. If any person shall conspire to break or enter any jail or other place of confinement of prisoners charged with crime (629) or under sentence, for the purpose of killing or otherwise injuring any prisoner confined therein; or if any person shall engage in breaking or entering any such jail or other place of confinement of such prisoners with intent to kill or injure any prisoners, he shall be guilty of a felony, and upon conviction, or upon a plea of guilty, shall be fined not less than five hundred dollars, and imprisonment in the State's Prison or the county jail not less than two nor more than fifteen years." 1893, ch. 461, sec. 1.
Sec. 2 is now Rev., 3200, and provides that the Solicitor shall prosecute and have the prisoners bound over to the Superior Court of an adjoining county.
Sec. 3 is as to witnesses testifying, and is Rev., 3699.
Sec. 4 of the Act of 1893 is Rev., 3233, in the chapter on "Criminal Proceedings," subhead Venue, and reads:
XI. VENUE.
"3233. Lynching. The Superior Court of any county which adjoins the county in which the crime of lynching shall be committed shall have full and complete jurisdiction over the crime and the offender, to the same extent as if the crime had been committed in the bounds of such adjoining county; and whenever the Solicitor of the district has information of the commission of such a crime, it shall be his duty to furnish such information to the grand juries of all adjoining counties to the one in which the crime was committed, from time to time, until the offenders are brought to justice." 1893, ch. 461, sec. 4. *Page 495 
Sec. 5, as to witnesses answering questions, is made Rev., secs. 3201 and 1638. Secs. 6 and 7 are the same as Rev., sec. 1288 and 2825. The whole of ch. 461, Laws 1893, is thus in the Revisal, and its force and effect is not impaired by the fact that it has been split up and its different sections placed under appropriate heads. It seems to us that the above provisions fully define the offense intended to be repressed, and designate the punishment and procedure. There are many (630) offenses in this chapter on Crimes which, though not common-law offenses, are not defined save by using a term of common knowledge, as "abandonment," "lynching," etc. It is not necessary to prescribe that an act is a misdemeanor or felony. The punishment affixed determines that. Revisal, 3291; S. v. Fesperman, 108 N.C. 772.
It was error to quash the bill on the ground that the offense was not committed in Union County, which is an adjoining county of Anson. Owing to the prejudice or sympathy which in cases of lynching usually and naturally pervades the county where that offense is committed, the General Assembly, upon grounds of public policy, deemed it wise to transfer the investigation of the charge to the grand jury of an adjoining county. Without some such provision an indictment could rarely be found in such cases. We cannot concur with the argument that such provision (Revisal, 3233) is beyond the scope of the lawmaking power and unconstitutional.
The Legislature of North Carolina has full legislative power, which the people of this State can exercise completely and as freely as the Parliament of England or any other legislative body of a free people, save only as there are restrictions imposed upon the Legislature by the State and Federal Constitutions. In the very nature of things there is no other power that can impose restrictions. When the Constitution uses the words "jury" and "grand jury" they are interpreted as being the same bodies, which were known and well recognized when the Constitution was adopted. But this is a rule of ascertaining the meaning of the words and not a restriction upon the power of the Legislature to make provisions as to venue and the like incidental matters, which in nowise affect the nature and composition of a jury and grand jury. Hence, the qualification of jurors, the number of challenges, venue, and other similar provisions as to procedure are in the discretion of the Legislature. (631)
The legislative power can be restrained only by constitutional provisions. It cannot be restricted and tied down by reference to the common law or statutory law of England. There is nothing in the common law or statute law of England which is not subject to repeal *Page 496 
by our Legislature, unless it has been re-enacted in some constitutional provision.
That the Federal Government is one of granted powers solely, and the State Government is one of the granted powers as to the Executive and Judicial Departments, but of full legislative powers except where it is restricted by the State or Federal Constitution, is elementary law. This is nowhere more clearly stated than by Black Const. Laws, secs. 100 and 101, as follows:
"Sec. 100. Under the system of government in the United States the people of each of the States possess the inherent power to make any and all laws for their own governance. But a portion of this plenary legislative power has been surrendered by each of the States to the United States. The remainder is confined by the people of the State, by their Constitution, to their representatives constituting the State Legislature. At the same time they impose, by that instrument, certain restrictions and limitations upon the legislative power thus delegated. But State Constitutions are not to be construed as grants of power (except in the most general sense), but rather as limitations upon the power of the State Legislature.
"Sec. 101. Consequently, the Legislature of a State may lawfully enact any law, of any character, on any subject, unless it is prohibited, in the particular instance, either expressly or by necessary implication, by the Constitution of the United States or by that of the State, or unless it improperly invades the separate province of one of the other departments of the government, and provided that the statute in question is designed to operate upon subjects within the territorial (632) jurisdiction of the State." To same purport McPherson v. Blacker, 146 U.S. 25; Ins. Co. v. Riggs, 203 U.S. 253.
That eminent authority, Cooley Const. Lim. (7 Ed.), 126 says: "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full andcomplete power as it rests in, and may be exercised by, the sovereign power
of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is entrusted with the general authority to make laws at discretion." On the next page he further says that "The American Legislatures may exercise the legislative powers which the Parliament of Great Britain wields, except as restrictions are imposed," by some inhibition in the State or Federal Constitution, but the Legislature cannot *Page 497 
exercise the judicial and executive functions of the British Parliament, which is supreme. This is a clear cut and very exact statement.
It is said by Judge Cooley, Cons. Lim. 128 (7 Ed.), quoting from ChiefJustice Redfield in Thorpe v. R. R., 27 Vt. 142: "It has never been questioned, so far as I know, that the American legislatures have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written constitutions. That must be conceded, I think, to be a fundamental principle in the political organizations of the American States. We cannot well comprehend how, upon principle, it should be otherwise. The people must, of course, possess all legislative power originally. They have committed this in the most general and unlimited manner to the several State legislatures, saving only such restrictions as are imposed by the Constitution of the United States, or of the particular State in question."
In S. v. Matthews, 48 N.C. 458, Judge Pearson said: "With the exception of the powers surrendered to the United States, each State is absolutely sovereign. With the exception of the restraints imposed by the Constitution of the State and the Bill of Rights, all legislative power is vested in the General Assembly." This is quoted by Bynum, J., with approval, S. v. R. R., 73 N.C. 537.
Our Legislature has the same legislative power as the British Parliament, except where some legislative power is expressly denied it by the Constitution of the State or Union, but, unlike Parliament, it cannot exercise judicial or executive functions, and that only because the Constitution has bestowed those functions upon the other two departments. If the State had adopted no Constitution, as was the case in Rhode Island, till 1843, the Legislature would have been supreme, as in England, subject only to the Federal Constitution, and there (633) is now, and necessarily can be no limitations upon the Legislature, save those expressly imposed by the State and Federal Constitutions as Judge Cooley well says. Under the North Carolina Constitution of 1776 the Legislature elected all the executive officers of the State and created and modified at will the judicial department and chose its officers.
The subsequent changes in the State Constitution have put the other two departments upon a more independent footing, but have not added any other limitations upon the legislative power of the General Assembly.
It has long been the statute that in the interest of justice the Court *Page 498 
can remove any cause, civil or criminal, to some adjacent county for trial. Revisal, 426-428. If the trial before the petit jury can by legislative authority be transferred to another county, the far less important matter of the venue of the inquiry and finding by the grand jury can also be transferred. In fact, it has often been provided that the grand jury may find a true bill in certain cases where the offense was committed beyond the limits of the county, as will be seen by references to other sections of the subhead in which Revisal 3233 is found, i. e., 3234: "When any offense is committed on waters dividing counties." 3235: "Where assault is in one county, death in another." 3236: "Assault in this State, death in another." 3238: Death in this State, mortal wound given elsewhere." 3237: "Person in this State injuring one in another." Also secs. 3403 and 3404 as to embezzlement and conspiracy by railroad officers, confer jurisdiction upon any county through which the railroad passes, and there are still other statutes giving the grand jury jurisdiction to inquire as to offenses committed out of their own county. The Legislature is not likely to increase needlessly the instances in which a grand jury can inquire into offenses committed out of its own county, but of the necessity of such statutes the General Assembly is sole judge.
Up to 1739, indictments for offenses occurring anywhere in (634) North Carolina were cognizable by a grand jury sitting in Chowan County, at Edenton. In that year the venue was changed to New Bern. From 1746 to 1806 — for sixty years — indictments were found in district courts, though the grand jury did not sit in the county where the offense was committed, unless that happened to be the county in which the Court was held, and this is the case still with all indictments in the Federal Courts.
If it were possible to hold that the Legislature cannot shape the criminal procedure of this State to provide remedies required by the exigencies of the present time, unless the same remedies had been found to be necessary in England and had occurred to and been adopted by those administering its laws in years long gone by, we find that in fact this same necessity of providing for the investigation by the grand jury of another county had been there provided for as to many offenses. In 4 Bl. Com., 303, we find that while a grand jury could not usually inquire as to offenses committed out of their county, by legislative authority this could be done in very many instances, among others, "Offenses against the Black Act, 9 Geo. I., ch. 22, may be inquired of and tried in any county in England at the option of the prosecutor;" "So felonies in destroying turnpikes, etc. (8 Geo. II. and 13 Geo. III., *Page 499 
ch. 84), may be inquired of and tried in any adjacent county;" and "murders, whether committed in England or foreign parts," may, by virtue of 33 Henry VIII, be inquired of and tried in any shire in England; "any felonies committed in Wales may be indicted in any adjoining county in England." 26 Henry VIII, ch. 6. And there are very many similar statutes there mentioned which were enacted, like the above, long prior to the American Revolution, thus showing that the venue of offenses cognizable before any grand jury is a matter of legislative enactment.
In 1 Stephen History Crim. Law in England, 277, it is pointed out that there are eighteen exceptions by statute to the (635) rule requiring an indictment to be found by a grand jury of the county (the first having been enacted as far back as 2 and 3 Edw. VI.), and he says their very number proves "that the general principle which requires so many exceptions is wrong." And on page 278 that distinguished Judge and author adds: "A rules which requires eighteen statutory exceptions and such an evasion as the one last-mentioned in the case of theft — the commonest one — is obviously indefensible. It is obvious that all courts otherwise competent to try an offense should be competent to try it, irrespectively of the place where it was committed, the place of trial being determined by the convenience of the Court, the witnesses, and the person accused. Of course, as a general rule, the county where the offense was committed would be the most convenient place for the purpose." England has about the same area as North Carolina, forty counties and a far denser population — now more than thirty millions. North Carolina has nearly two and a half times as many counties (97) and about two million people. The population of the average English county is therefore forty times that of an average county in this State. If, nevertheless, the public interest requires that even in England the finding of an indictment shall not be restricted always to a grand jury in the county where an offense is committed, for a stronger reason the Legislature here must have power in its judgment to change the venue in the interest of justice, with our smaller counties and sparse population.
The venue of a grand jury "is a matter under the control of the Legislature." S. v. Woodard, 123 N.C. 710. S. v. Patterson, 5 N.C. 443, is put on the express ground that the statute did not give the grand jury jurisdiction of an offense committed in an adjacent county, as had been the case under the previous district system. Besides, if there had been a defective venue the remedy was by a plea in abatement (which is practically a motion to remove to the proper (636) *Page 500 
county) and not a motion to quash. Revisal, 3239; S. v. Carter,126 N.C. 1012; S. v. Lytle, 117 N.C. 801.
It was also error to quash the first count. The indictment is against Lewis, and in charging that he "conspired with others" the bill complies with Revisal 3698, which simply provides that, "If any person shall conspire to break," etc. It was not required to name the others, or to charge that they were unknown. The words "with others" is tautology and mere surplusage. The "con" in the word "conspire" embraces the idea that it is an act done "with" another or others. Even if the statute had used the words "with others," it would have been sufficient to recite in the bill "with others" without charging their names, or that they were unknown. Revisal, 3250; S. v. Hill, 79 N.C. 658; S. v. Capps, 71 N.C. 96.
Reversed.