## 11535

### KIRKLAND v. ALLENDALE COUNTY

#### (123 S. E., 648)

1. COUNTIES—IN ACTION FOR EXEMPLARY DAMAGES FOR LYNCHING, EVIDENCE HELD TO SUPPORT DIRECTED VERDICT.—In an action against the County, under Const., Art. 6, § 6, and Civ. Code 1922, § 5601, to recover exemplary damages for the lynching of plaintiff's intestate, evidence *held* to support a directed verdict for plaintiff.

2. CONSTITUTIONAL LAW—CONSTITUTION SHOULD RECEIVE LIBERAL INTERPRETATION.—A Constitution should receive a liberal interpretation, especially with respect to provisions designed to promote security and safeguard a citizen's liberty.

3. CONSTITUTIONAL LAW—CONSTITUTION SHOULD BE INTERPRETED IN VIEW OF TIMES IN WHICH IT WAS FRAMED.—A constitutional provision should be construed in view of the times in which it was framed, and with due regard to evil it was intended to remedy, so as to give it effective operation, and suppress the mischief at which it was aimed.

4. COUNTIES—CONSTITUTION AND STATUTE AUTHORIZING EXEMPLARY DAMAGES FOR LYNCHING LIBERALLY INTERPRETED.—Const., Art. 6, § 6, and Civ. Code 1922, § 5601, making County liable for exemplary damages in cases of lynching, should receive a liberal interpretation to the end that the remedy prescribed should not be denied in any case coming substantially within their spirit.

5. COUNTIES—ACTS OF MOB HELD "LYNCHING."—Where mob bent on killing Negro prisoner took him from Sheriff and, while seriously wounded and bleeding, carried him a considerable distance in an

automobile and left him lying therein more dead than alive, without medical or other attention, there was a "lynching" rendering County liable under Const., Art. 6, § 6, and Civ. Code 1922, § 5601, if such acts contributed to his death, even though he was dead before his body was hanged or burned.

6. COUNTIES—IF ACTS OF LYNCHERS CONTRIBUTE TO A DEATH, COUNTY IS LIABLE.—Under Const., Art. 6, § 6, and Civ. Code 1922, § 5601, where a lynching has been perpetrated, County is liable if the act or acts of lynchers contributed to or hastened victim's death.

Before HENRY, J., Allendale, October, 1923.    Affirmed.

Action by Lillian B. Kirkland, Administratrix of the Estate of Edward Kirkland, deceased, against Allendale County. From a judgment entered on a directed verdict in favor of plaintiff, defendant appeals.

*Mr. R. P. Searson,* for appellant, cites: *Duty of bystander to arrest escaping felon:* Criminal Code 1922, Sec. 1. *Direction of verdict improper:* 85 S. C., 479; 89 S. C., 36; 91 S. C., 439; 99 S. C., 187.

*Mr. James E. Davis,* for respondent, cites: *Circumstantial evidence as establishing crime:* 59 N. E., 439; 27 Tex., 329; 143 Ky., 137; 176 N. C., 704; 2 A. L. R., 1220. *Concealment of body as establishing crime:* Wells Circumstantial Evidence 118; 50 N. E., 503; 157 N. Y., 584.

June 26, 1924.

The opinion of the Court was delivered by MR. JUSTICE MARION.

The presiding Judge, Hon. J. K. Henry, directed a verdict for the plaintiff in an action against Allendale County, to recover exemplary damages in the sum of $2,000, for the lynching of the plaintiff's intestate, Edward Kirkland. The appeal questions the correctness of that ruling upon grounds which are, in substance, embraced in the contention that the evidence was reasonably susceptible of other inferences than that the death of plaintiff's intestate ensued as a proximate result of "lynching at the hands of a mob."

The appellant, in argument, states that the following facts are undisputed: On October 24, 1921, Edward Kirkland, a negro, shot and killed Mr. Eugene Walker, a prominent white citizen, on the streets of Appleton. In attempting to escape, Kirkland was shot in the knee by Mr. R. H. Walker, a cousin of the deceased, who saw Kirkland shoot Mr. Eugene Walker, and who had pursued Kirkland to the edge of the town of Appleton. Shortly after Kirkland was thus arrested, the sheriff of the county arrived on the scene and found Kirkland's leg "pretty badly torn up," and bleeding freely from the wound inflicted by Mr. R. H. Walker. The sheriff, accompanied by R. H. Walker and a Mr. Jones, then carried Kirkland by a roundabout route to Gifford, a station on the Seaboard Air Line Railway in Hampton County. There the sheriff, with his prisoner, boarded the train for Columbia. It was necessary to pass through Fairfax, in Allendale County. At Fairfax a number of masked men boarded the train, took the prisoner, and carried him by automobile back to Appleton. That night at Appleton, about 8 o'clock, a negro lodge building was burned, and from the ruins next day a charred unrecognizable body, with a wire cable around the neck, was taken out and buried.

We think the evidence establishes, to the exclusion of any other reasonable inference, the following additional facts: That when Kirkland was taken by the mob from the train at Fairfax he was alive, despite the fact that during the several hours he had been in the custody of the high sheriff of the county he had been given no medical or first aid attention; that the charred body taken from the ruins of the negro lodge building, burned about eight o'clock in the evening, following the taking of Kirkland in the afternoon at Fairfax, was the corpse of Edward Kirkland; and that from the time of the taking of Kirkland, alive, at Fairfax until the hour of the burning of the lodge building, he was in the hands of the mob.

But, conceding that the death of Kirkland ensued after he was taken from the train at Fairfax and while he was in the custody of the mob, appellant says there was evidence tending to establish that his death was caused by the gunshot wound inflicted by R. H. Walker, in making a lawful arrest, and not by any act or omission of the lynching party. The sheriff testified that when he put Kirkland on the train at Gifford he expected him to die in a few hours. R. H. Walker testified that he saw Kirkland lying in the foot of an automobile after he had been brought back from Fairfax to Appleton; that he did not know whether he was dead or not; that he was still bleeding, and that he saw no signs of life. F. H. Boyd, a physician, testified that he saw Kirkland in an automobile, about 4 o'clock in the afternoon, at Appleton; that he was then breathing 4 or 5 times to the minute, and that he thought he could live possibly an hour. W. R. Johns testified that he saw Kirkland in the automobile at Appleton about 4 o'clock in the afternoon, and that there were "no signs of life in him by feeling of the body." Since the lodge building was not burned until 8 o'clock, appellant contends that the foregoing evidence is readily susceptible of the inference of fact that Kirkland was dead when put in the building which was burned, and that his death was the proximate result of the gunshot wound lawfully inflicted, and not of any "lynching." Hence appellant contends as a matter of law that the jury were entitled to find that this was not such a case of "lynching when death ensues" as would render the county liable, and that the trial Judge erred in not submitting the case to the jury.

The language of the constitutional provision (Article 6, § 6), and of the statute enacted in conformity therewith (Section 5601, Vol. 3, Code 1922), is as follows:

"In all cases of lynching when death ensues, the county where such lynching takes place shall, without regard to the conduct of the officers, be liable in exemplary damages," etc.

Since the statute does not purport to cover any broader field than the self-executing provision of the Constitution, in so far as the question here involved is one of construction, it is to be resolved by applicable rules of constitutional construction. That it is a fundamental canon of construction that a Constitution should receive a liberal interpretation, especially with respect to provisions which were designed to promote the security and safeguard the liberty of the citizen, is well settled. 6 R. C. L., p. 49, § 44. That the salutary object of this constitutional provision was to promote, through the means prescribed, the observance of certain other provisions of the constitutional charter, guaranteeing the citizen against deprivation of life, liberty, or property without due process of law, etc., is not open to question. See *Brown v. Orangeburg,* 55 S. C., 45; 32 S. E., 764; 44 L. R. A., 734. Another familiar general principle of interpretation of Constitutions is that a provision should be construed in the light of the history of the times in which it was framed, and with due regard to the evil it was intended to remedy, so as to give it effective operation and suppress the mischief at which it was aimed. 6 R. C. L., 50, 51, §§ 45, 46; see *Brown v. Orangeburg, supra.* In the historical aspect the nature of the evil against which this constitutional provision was leveled requires no comment. Applying the foregoing general principles of interpretation, this provision, as we apprehend, should receive a liberal interpretation to the end that the remedy prescribed to check the evil aimed at should not be denied in any case which comes substantially within the spirit of the law.

It has been said that the word "lynching" has "no technical legal meaning," but is merely a descriptive phrase which "is universally understood to signify the illegal infliction of punishment by a combination of persons for an alleged crime." *State v. Lewis,* 142 N. C., 626; 55 S. E., 600, 610, 611; 7 L. R. A. (N. S.), 669; Ann. Cas. 604. It has been defined by a legal lexicographer as:

"A term descriptive of the action of unofficial persons, organized bands, or mobs, who seize persons charged with or suspected of crimes, or take them out of the custody of the law, and inflict summary punishment on them, without legal trial, and without warrant or authority of law." Black's Law Dictionary p. 737.

The contention is not made that the persons who took Kirkland from the custody of the sheriff did not constitute such a "mob" or "unlawful assemblage" as would impress their action with the character and significance of a "lynching." See *Canty v. Clarendon County,* 101 S. C., 141; 85 S. E., 228.

Under the undisputed facts above adverted to, we think this was a case of lynching within the meaning of the Constitution. In so far as appellant's position would seem to embrace the contention that a "lynching" was not proved, to the exclusion of any other reasonable inference, the contention is obviously predicated upon the view that the undisputed facts as to the action of the mob did not conclusively establish that any summary punishment was inflicted upon Kirkland. That position, we think, is untenable. The action of the mob in laying violent hands upon this seriously wounded negro at Fairfax, in taking him from the ostensible custody of the sheriff, in carrying him, bleeding and weakened from the loss of blood, a considerable distance by automobile to the town of Appleton, in leaving him there for an indefinite time "in the foot" of an automobile, more dead than alive, without medical or other attention, sufficiently establishes the element of summary punishment by the infliction of physical injury, which appellant assumes to be an essential ingredient of the crime of lynching, regardless of whether the victim was thereafter burned or hanged, in due form of lynch law.

But even if there was a lynching, appellant's main contention is that the evidence did not conclusively establish that it was a case of "lynching when death ensues," within the meaning of the Constitution. It is worthy of obser-

vation that the framers of the Constitution did not employ in this connection a word of familiar use and import in the law of proximate cause. The language is not, "in all cases of lynching when death is caused thereby, or when death results therefrom," but, "in all cases of lynching when death ensues." The word "ensue" in its primary signification means "to come after," to follow in the order of happening or in the course of time, without any necessary causal connection between what went before and what follows. See Cent. Dict. While the term as here employed may not soundly be construed to have been used in a sense that does not involve causal connection, the breath of the term used, considered in connection with the primary object of the provision as a whole, would seem clearly to indicate that the causal connection contemplated was not necessarily that involved in the ordinary action to recover damages for a tort. The primary object of the constitutional provision in this aspect of the question was to impose a penalty for a crime, to the end that the commission of the crime might be deterred, and only secondarily to give a right of action for damages to a designated class of persons.

Hence, where the crime of lynching has been perpetrated and has been followed by the death of the victim, the essential causal connection between the lynching and the death is that recognized and applied in the criminal law of homicide. The liability of the county is to be tested by the same rule which would apply in fixing the responsibility of the lynchers for a felonious homicide. It is a rule which has been applied by a number of Courts to determine civil responsibility for the death of diseased or injured persons. See note, Ann. Cas. 1912A, 965. That rule is that, if the act or acts of the lynchers contributed to or hastened the death of the deceased, they were criminally liable for causing such death. *State v. Foote,* 58 S. C., 220; 36 S. E., 551. *State v. Chiles,* 44 S. C., 338; 22 S. E., 339. In the case of a prior fatal injury, the rule has been thus stated:

"If the deceased was suffering from a prior fatal injury, and defendant's act contributed to or accelerated his death, defendant is liable." 29 C. J., 1082, 1083, § 57.

In the case of *State v. Foote, supra,* this Court sustained a charge of the Circuit Judge in this language:

"It matters not whether the death is attributable to the gunshot, but if it hastened his death, but for a minute, he [the defendant] would be responsible for the death."

In that view appellant's contention resolves itself into the proposition that the evidence is reasonably susceptible of the inference that the action of the mob, which we have held constituted a lynching, did not contribute to or, in any appreciable degree, accelerate the death of Kirkland. We think the learned Circuit Judge's ruling to the contrary must be sustained. Conceding that there was evidence to support an inference that Kirkland was dead when placed in the burning building, with a wire rope around his neck, and that the act of hanging and burning a corpse was a form of insensate procedure for which mob psychology might easily account, the evidence as a whole is open to no other reasonable inference than that the death of Kirkland was contributed to or accelerated by the conduct of the lynchers. If, as appellant argues, Kirkland was in extremis as the result of a gunshot wound, when seized by the mob at Fairfax, and died before he could be hanged or burned, in the face of the undisputed facts that he was subjected to physical handling, if not manhandling, and transported in that condition from Fairfax to Appleton, and then left in the foot of an automobile, without care or attention (*Williams v. State,* 2 Tex. App., 271. *Reg. v. Martin,* 11 Cox. C. C., 136) by a mob bent upon encompassing his summary death, we perceive no valid reason, suggested by common sense or grounded in common experience, to impeach the conclusion of the Circuit Court—that the evidence was open to no other sound inference of fact than that the lynching contributed to or accelerated the death of the mob's victim. If so, it was a case of "lynch-

ing when death ensues," within the meaning of the law, and the verdict was properly directed.

The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES WATTS, FRASER and COTHRAN concur.

MR. CHIEF JUSTICE GARY did not participate.