ZMUNT ET AL., BOARD OF COMMISSIONERS OF CUYAHOGA
COUNTY, v. LEXA.

(Decided June 23, 1930.)

*Mr. Ray T. Miller,* for plaintiffs in error.
*Mr. Carl D. Ainger,* for defendant in error.

LEVINE, J.   Error proceedings are prosecuted by plaintiffs in error, county commissioners of Cuyahoga county, who were defendants in the trial court, from the decision of the common pleas court rendering judgment in favor of Christ Lexa, plaintiff therein, in the sum of $3,500.

The petition of plaintiff, defendant in error here, was based upon the provisions of Sections 6278 to 6289, General Code, usually referred to as an "Act for the suppression of mob violence."

Defendants moved for the dismissal of the petition after the opening statement of counsel, which motion was overruled, and exception duly taken.   The motion was renewed at the conclusion of the testimony offered by the plaintiff, and again at the conclusion of all the testimony, which the court overruled, and an exception was duly taken.   After verdict, a motion for new trial was filed within the time allowed by law, which motion was overruled and duly excepted to.

The operative facts disclosed by the record are clearly recited in the brief of plaintiffs in error as follows:

The plaintiff, Christ Lexa, and another, Costa

Naum, were employed in the lunch room at 6018 Quincy avenue in the city of Cleveland in Cuyahoga county. They worked during the nighttime. On Sunday morning, August 16th, eight men entered, and four of them sat down and ordered something to eat. The other four ate nothing, but purchased some cigars or cigarettes. While the four who were eating were so engaged, and were being waited on by this plaintiff, he asked them to pay as they were served. One of them answered, ''Well, you'll get your money all right. Don't worry.'' The other men stood at the other end of the lunch room at the cigar counter and seemed to be waiting for the four men who were eating. The four who had been at the cigar counter started out without paying, and Naum, who had waited on them, demanded payment. After they refused to pay he attempted to stop them from going out. A general tussle ensued, in which these four attacked Naum and were probably dragging him through the door out into the street when plaintiff responded to Naum's call for help. Thereupon the other four entered the affray and the two soon found themselves beset by the entire eight. At this juncture the plaintiff was shot in the leg, the bullet entering his right leg near the knee and coming out just below the ankle. It is not known who shot Lexa, nor is it even known that one of these eight men shot him. While there is slight conflict in the testimony, it seems that there were no others in the store at the time; nor is it likely that the shot came from outside the store. It is therefore a reasonable inference that the plaintiff was shot by one of the eight men, but whether he was shot by one of the four who originally attacked him, or by one of the other four,

is not known. Neither Naum nor Lexa was armed.

It was stipulated by and between the parties that the plaintiff sustained no permanent injuries.

The sections of the Code upon which the common pleas court permitted a recovery in this case are the following:

Section 6278, General Code: "A collection of people asembled for an unlawful purpose and intending to do damage or injury to any one, or pretending to exercise correctional power over other persons by violence and without authority of law, shall be deemed a 'mob' for the purpose of this chapter. An act of violence by a mob upon the body of any person shall constitute a 'lynching' within the meaning of this chapter."

Section 6279, General Code: "The term 'serious injury,' for the purpose of this chapter, shall include such injury as permanently or temporarily disables the person receiving it from earning a livelihood, by manual labor."

In the brief of learned counsel there is a minute discussion about various phrases used in Section 6278, which, in the opinion of counsel, is in need of judicial interpretation.

For the purpose of this case and its review, we encounter but slight difficulty in getting at the substantial meaning of the section. A "collection of people" is the same as a getting together of people, or an assemblage of people, and, while the statute does not state as to how many persons would constitute such a "collection of people," we are content with the able citations contained in the brief of counsel.

Borrowing the common-law conception, it is gen-

erally well settled that it means "a number of persons, not less than three." If three or more persons assemble for an unlawful purpose, namely, either to do damage or injury to any one, or on the pretense of exercising corrective power over other persons by violence, and without authority of law, such assemblage is deemed a mob within the purport of the law.

There was at one time a fundamental difference of opinion amongst judges, as disclosed in early decisions, upon the general scope and operation of the statute. Thus, we find the theory of one court to be that the operation of the statute is limited to cases in which there is an attempt at lynching. *Gray* v. *Gibson,* 12 N. P. (N. S.), 673, 22 O. D., N. P., 326.

The overwhelming weight of opinion seems to be that the statute is not confined to acts of violence by a mob against one apprehended for committing a crime; a right of action accrues for acts of violence against persons not so held in custody.

We hold that under the statute a "mob" may be constituted in either of two ways: First, as an assembly for an unlawful purpose, and intending to do damage or injury to any one. Second, it may consist of a collection of people pretending to exercise correctional power over other persons by violence, and without authority of law. The unlawful purpose must be present in either instance. It may disclose itself in an intention to do damage or injury to any one, or it may appear in the form of a pretension to exercise correctional power over other persons by violence and without authority of law.

As to when the unlawful purpose must form, that is clearly settled in the case of *Board of Commrs. of Champaign County* v. *Church, Admr.,* 62 Ohio

St., 318, 57 N. E., 50, 48 L. R. A., 738, 78 Am. St. Rep., 718, wherein the court held that it is not necessary to liability under this statute that the mob assemble with an unlawful purpose. Liability is imposed, although it assembled without any unlawful purpose, and afterwards committed the acts of violence which resulted in the death or injury of a person. In other words, the unlawful purpose need not precede the assembling of the people. It may take place after the people have assembled.

To hold that the mere fact that there is an assemblage of people, and an act of violence committed upon the body of any person, brings this case within the terms of the statute, regardless of the purpose of the assemblage, is, in our opinion, a rather violent interpretation of the law as it now reads. The ever-present "unlawful purpose," whether it be formed preceding the assembling of the people, or after the people have assembled, characterizes the statutory definition of a mob. It may disclose itself by an intent to do damage or injury to any one, or by a pretense of exercising correctional power over other persons by violence and without authority at law.

When the circumstances of a given case clearly refute the existence of the element of "unlawful purpose" in one of the two ways set forth in the statute, the assemblage of people does not constitute a mob within the meaning of the law, even though some disturbance resulting in injury to another person takes place.

We agree with counsel for plaintiffs in error that the terms "lynching" and "mob" must be understood in the light of their historical background.

"The word 'lynching' originally signified a whip-

ping for reformatory purposes with more or less disregard for its legality, or the infliction of minor punishments without recourse to law." Encyclopedia Britannica, under the title "Lynch Law."

"Lynching. The act of executing lynch law upon a person; the killing of a person by a mob under pretense of summary justice." Century Dictionary.

"Orig. U. S. To condemn and punish by lynch law. In early use, implying chiefly the infliction of punishment such as whipping, tarring and feathering, or the like; now only to inflict sentence of death by lynch law." Oxford Dictionary.

"The practice of inflicting summary punishment upon an offender by a self-constituted court armed with no legal authority; it is now limited to the summary execution of one charged with some flagrant offense." Oxford Dictionary.

"And since the term 'lynch law' came into colloquial use it is loosely employed to cover any case in which a portion of a community takes the execution of its ideas of justice into its own hands, irrespective of the legal authorities." Encyclopedia Britannica.

Writing on the subject of "lynching," Professor Albert Bushnell Hart, in the Cyclopedia of American Government, says; "The characteristic of mob rule is that it is made up of people permeated with a blind instinct of destruction, and leaders are likely to be swept aside. The mob is simply a return for the time being to the primitive conditions of unorganized society."

The word "lynching," as we find it in popular use, and also as the Legislature intended to use it, involves a situation wherein a group of persons usurp

unto themselves the ordinary power of government and thereby exercise correctional or disciplinary authority over others.

When the statute speaks of "exercising correctional power," it intended a case where a mob seeks to punish one who has violated the law or the accepted standard of conduct of the community. There can be no question that this act of the Legislature resulted, in the main, from the demands which were made by an aroused public opinion against outrages committed upon negroes charged with crime. The hysterical period in the South, which followed the war, gave rise to a destructive movement, exemplified by the "Ku Klux Klan" and the "Night Riders." The lynching of negroes accused of crimes, so common in the South, threatened to become frequent in Ohio. The Legislature merely responded to public demand to impose a liability upon a county whose officers had failed and neglected to protect persons from mobs.

The recovery authorized by statute is penal in its nature, namely, to impose a penalty upon the inhabitants of a community for permitting riots, and to incite them to suppress and prevent the same by making it a matter of interest to the taxpayers to give their moral support to the enforcement of the law and order.

As to the phrase, "intending to do damage or injury to anyone," it is urged by counsel for plaintiffs in error that the Legislature intended thereby a group of persons having a common interest and feeling that the law gives them no protection, who make a law for and unto themselves by resort to violence. This, in our opinion, is too narrow a conception

of the meaning of the phrase. The belief of the as-
semblage in the righteousness of their cause does
not constitute an element. If a group of persons as-
semble with a definite fixed purpose to do injury,
such assemblage clearly comes within the wording
of the statute, but such intent to do damage or injury
to any one must be ever present. Whether it was
formed before the assemblage had collected or after-
wards is immaterial.

In the case at bar it is quite clear that the eight
persons who were in the lunch room at the time
of the disturbance which is the basis of this action
did not assemble with an intent to do injury to any
one. The disturbance arose from the effort of four
of their number to leave the place without paying
for certain goods sold to them at the cigar counter.
The employee in charge of the cigar counter very
properly attempted to stop them from leaving with-
out paying for the goods purchased. These four,
whom the employee sought to prevent from leaving,
set upon the employee. The other employee in charge
of the restaurant came to his rescue. It was at that
time that the other four who were in that part of
the place called the restaurant came upon the scene.
Somebody fired a shot. If the employee had not en-
deavored to prevent these persons from leaving the
place, nothing would have taken place.

It cannot be said that the assembled people formed
an intent to do injury. It was merely a case of a
free-for-all fight, a common disturbance, and no
more. The fact that a shot was fired does not alter
the situation, for the reason that, in order to bring
the case within the purview of the statute, the in-
tent to do injury to any one must be present, not

merely in the mind of one person who is a member of the assemblage, but as the purpose characterizing the assemblage.

From the evidence presented in this case we are not justified in inferring. that an unlawful purpose, an intent to do injury to any one, characterized the assemblage of these eight persons. Quite the contrary seems to be clear.

The law as it now stands does not, in our opinion, intend to include cases of common disturbance, without purpose or intent, but arising on the spur of the moment in the course of an argument or altercation between various people.

Were we to hold that the statute is intended to cover a case like the one at bar, the inroads upon the county treasury would become so threatening and enormous as to create a public emergency, for every case of street fighting or disturbances arising from backyard disputes would offer itself as a proper case for compensation by the county treasurer. It was not so intended by the Legislature.

We conclude therefore that the circumstances presented by the record of this case not only fail to establish an unlawful purpose characterizing the assemblage to do injury to any one, but clearly negative the same.

Holding as we do, the judgment of the common pleas court is reversed, and judgment is entered in favor of plaintiffs in error.

*Judgment reversed, and judgment for plaintiffs in error.*

VICKERY, P. J., and SULLIVAN, J., concur.