[Crim. No. 2165.   Second Appellate District, Division Two.—March 16, 1933.]

THE PEOPLE, Respondent, v. HAROLD C. MURPHY, Appellant.

Frederic H. Vercoe, Public Defender, for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendant was convicted of simple assault under the first count of an information, which charged assault with a deadly weapon, and was found guilty under the second count, which charged a violation of section 109 of the Penal Code, denouncing the crime of assisting the escape of one in the custody of the law. The appeal of defendant is general and is from the judgment and from an order of the trial court denying his motion for a new trial, but he complains only of the judgment and order under the second count.

The point is settled without dissent, in those few jurisdictions in which it has arisen, that one cannot be guilty of such a crime as that specified in section 109 of the Penal Code unless his effort accompanies an actual attempt upon the part of someone else to free himself from the confinement of prison walls or from the custody of some minion of the law. The question is one of first impression in California, but the unanimity of decision elsewhere seems based upon reason and logic. One can only *assist* another in what that other makes an effort to do of his own volition. If one attempts to free that other from restraint without any effort on the latter's part the crime is a rescue, denounced in this state by section 101 of the Penal Code. "These indictments being for the offense of aiding Wesley Hubert, a prisoner, to escape from custody, the first question is whether the offense proved was the one charged, or whether it was the offense of rescue. The two relevant sections of the code are as follows: 'Rescue is the forcibly and knowingly freeing another from arrest or imprisonment.' Section 4478. 'If any person shall aid or assist any prisoner to escape, or attempt to escape, from the custody of any sheriff, coroner, constable, officer or other person who shall have the lawful charge of such prisoner, such person so offending shall, on conviction, be punished,' etc. Section 4483. We

think that rescue takes place where there is no effort on the part of the prisoner to escape, but his deliverance is effected by the intervention of others, without his cooperation; whereas the offense of aiding a prisoner to escape consists in inciting, supporting or reenforcing his exertions in his own behalf, tending to the accomplishment of that object'' (*Robinson* v. *State*, 82 Ga. 535 [9 S. E. 528]. See, also, *Harvey* v. *State*, 8 Ga. App. 660 [70 S. E. 141]; *State* v. *Sutton*, 170 Ind. 473 [84 N. E. 824]; *State* v. *Christian*, 253 Mo. 382 [161 S. W. 736]; *King* v. *Tilley*, 168 Eng. Rep. (Crown Cases) 433; *Rex* v. *Martin*, 168 Eng. Rep. (Crown Cases) 757).

■ With this rule of law stated we now come to the facts of the present case. Appellant is charged with assisting the escape of one Nathan from the custody of a police officer. There is not the slightest direct evidence in the record of any attempt upon the part of Nathan to effect an escape, but the attorney-general insists that there is evidence upon which the jury might justly have inferred that such an attempt was made. We shall recite some of the evidence, in general, first, and shall then state that upon which respondent relies.

A police officer named Pursley, while on his beat at about 1:30 A. M., discovered an automobile parked in the street about fifteen feet from the curb line. Appellant and Nathan were in the front seat of the car, appellant being at the steering-wheel. The vehicle belonged to appellant. The two men were ''fighting'', as the officer put it. He said that he ''found one fellow in a very drunken condition, who was wanting to drive, and the other fellow would not let him drive''. The drunken one was Nathan, but there was later evidence that appellant was also somewhat intoxicated. After some conversation the officer told Murphy to ''take his car and go on home, and I would take care of the other fellow; so I gets Nathan over to the box''—meaning a police telephone box. Before he took Nathan, however, appellant, Pursley said, ''tried to talk me into letting him go'', but the officer would not do so. When asked as to appellant's condition Pursley said, ''He was sober''—''sober enough to take care of himself''. He said Nathan ''was very drunk''. In speaking of his taking Nathan over to the box the officer said: ''I told him, . . . 'You come and go with me,' and

he said, 'All right,' and he went very freely across the street, about 50 or 75 feet from the car, catercornered across the street, and sat down by the box very quietly." In the meanwhile appellant procured a wrench from the tool kit in his car and approached the other two, the officer standing at the telephone and Nathan sitting on the curb beside the pole to which the box was attached. Pursley did not see appellant's approach. He said, "I had called for the car to come out, and as I turned from the box, just turned around, Mr. Murphy struck me with a wrench right over the eye, cutting the eye on the inside and bruising the eye until it has been sore ever since." The blow also loosened teeth on one side of Pursley's head. It was for this attack that appellant was convicted of simple assault under the first count of the information. The blow rendered the officer unconscious and he fell to the pavement. "I was out; I don't know for how long. . . . When I came to and looked around there was no one in sight." Appellant and Nathan had both disappeared. The officer had taken their names and addresses when he first saw them and they were both arrested at appellant's home a little more than two hours later, where they were apparently awakened from sleep.

There was much testimony as to the condition of Nathan during the times that are of interest here. Police Sergeant Sweetman passed by soon after Pursley discovered appellant and Nathan and stopped a few moments. He said on the stand: "Nathan was then in the car and he was slouched over in the front seat and trying to talk. He kept up a continual attempt." This same officer also testified: "Q. When you saw Mr. Nathan at that time and place, did you form an opinion as to whether or not he was intoxicated? A. I did. Q. Was he intoxicated? A. Yes, sir, he was. Q. How did he act? A. He was slouched over in the machine, in a position to show that he was not physically able to take care of himself, and half of what he said you could not understand. He talked continually." And again, from the sergeant's testimony: "Q. Do you think he could have climbed into an automobile without assistance at that time? A. I doubt it very much. Q. In your opinion, he had passed beyond the state of intoxication where a man is merely being reckless, and had proceeded to the stage where he was

stupid and on the point of unconsciousness? A. Yes, to the point where he was not capable of taking care of himself. Q. Or doing anything to help himself? A. He could probably walk, but he was not in a safe condition; he would be liable to fall before he got very far. Q. Do you think he was in any condition to know what he was doing, or what anybody else might do in his behalf? A. No, I don't believe he was. His conversation was unintelligible, and you could not piece it together.'' Police Officer Imbler was one of those who arrested appellant and Nathan. He testified thus of Nathan's condition at the time: ''How did Mr. Nathan's intoxicated condition manifest itself to you? A. To the extent of his intoxication? A. Yes, how did you know; how did he act? A. He was not able to stand firmly by himself, and his speech was thick, and we had to half dress him ourselves. Q. Did any of the things he said to you make sense at all? A. No, I would not say they did. He would go from one subject to another. Q. In your opinion, was he so intoxicated that he did not know what he was doing at all, or know what others were doing about him? A. At that time I believe he had some idea; that is, he had enough physical condition to carry himself from the house out to the car by his own power, and in some of his conversation he seemed to be all right. Q. You think if he had been as drunk as described in my question that he had partially recovered from it when you saw him? My question was whether he knew what he was doing or what others about him were doing; in your opinion, if he had been in that condition, when you saw him he had partially recovered, when you got there. Is that what you mean? A. I don't understand. Q. How drunk was he? Was he so drunk he did not know what he was doing, or what other people around him were doing? A. He apparently did not from the conversation he had.'' Officer Tucker was with Imbler when the arrest was made. He testified, after saying that he had heard Imbler's testimony: ''Q. Your answers would be the same if I asked the same questions? A. Not exactly. Q. What is your opinion? A. I would say he was a little drunker than the other officer stated he was.''

The attorney-general advances these three propositions: 1. That Nathan was not so drunk that he was unable to

form an intent to escape. 2. That he did in fact escape. 3. That he was assisted in the escape by appellant.

In support of the first proposition reference is made to the fact that when Pursley told Nathan to come with him the inebriate responded, "All right." Attention is called to the fact that Nathan then "went very freely across the street and sat down by the box very quietly"; but it must here be observed that the statement that he went freely is to be construed that he went willingly, especially as Pursley testified on cross-examination that Nathan "could not walk without help". The attorney-general also refers to Imbler's statement concerning Nathan's condition at the time of the arrest, to the effect that Nathan "at that time . . . had some idea" and that "he had enough physical condition to carry himself from the house out to the car by his own power, and in some of his conversations he seemed to be all right". If we concede—although the concession is quite likely of doubtful propriety—that these items of evidence show a substantial conflict with other evidence upon the question whether Nathan was in a frame of mind which enabled him to hatch up an intent to escape, we are brought into insuperable difficulty under the next proposition advanced by respondent.

The proposition is that Nathan did in fact escape. We think this thesis is unjustified by the evidence. Nathan certainly made no endeavor to effect an escape before the cruel blow was inflicted by appellant upon Pursley. That blow and the consequent unconsciousness of the officer immediately effected a rescue. From the moment the officer ceased to be a sentient being Nathan was relieved of his thralldom. As in the case of a blockade under the rules of war, the custody of a policeman over his prisoner, "to be legal must be effective". No effort was necessary on his part to free himself. Suppose the officer had been killed. Would Nathan then still have been a prisoner? If so, a prisoner to whom? Suppose, without the intervention of appellant and without even his presence in the proximity of policeman and prisoner, that Pursley had suffered a violent heart attack and had fallen to the pavement while he stood at the telephone box. Would Nathan longer have been his prisoner? Certainly a dead man cannot maintain a custody over another. Why is not this truism applicable

in such an instance as this? How did Nathan know whether or not Pursley had passed to the great beyond after appellant had struck the villainous blow, granting that he had the sense left with which to know a blow had been inflicted? Was he bound to tire himself by waiting beside the recumbent Pursley, his former custodian, in order to determine whether he would survive or succumb, and if the former, then resubmit himself to custody? We think not. As we have said, Nathan was the donee of a rescue when appellant struck Pursley down. Then he had the right to "fold his tents like the Arabs and as silently steal away".

This view disposes of the third proposition of respondent, that appellant "assisted" Nathan to escape.

Fortunately, it appears not to be too late, if the authorities be so advised, to inform against appellant for a rescue of Nathan.

The evidence was insufficient to support the verdict.

Having reached this conclusion it becomes unnecessary to consider other points made by appellant.

Judgment and order reversed as to the second count of the information.

Craig, J., and Stephens, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1933.

Seawell, J., Shenk, J., and Curtis, J., dissented.