[Crim. No. 1761. First Appellate District, Division One.—February 23, 1934.]

THE PEOPLE, Respondent, v. JAMES CASCINO et al., Appellants.

Nathan C. Coghlan, Harry S. Whitthorne and William Ferriter for Appellants.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

KNIGHT, Acting P. J.—The appellants Cascino, Tartaro and Cirimele were found guilty by a jury of the crime of second degree burglary, and they have appealed from the judgment of conviction, urging as grounds for reversal insufficiency of evidence and error in the giving and the refusal to give certain instructions.

The place alleged to have been burglarized was a grocery store on the corner of Fillmore and Jackson Streets, San Francisco. Shortly after midnight, Officers McLaughlin and Schuler, while patroling their district in a radio-equipped police car, received instructions over the radio to proceed to said corner, and as they approached the grocery store they observed two men standing close to the side door thereof located on Jackson Street twenty-eight feet from the corner of Fillmore and set in from the property line about twelve inches. Officer McLaughlin alighted and as he neared the side entrance he saw a third man "coming out" of the doorway. The door had been broken in from the outside, evidently by someone forcing his weight against it, because the door casing had been torn away. The man seen coming out of the doorway proved to be Tartaro. He was a large man, about six feet tall and weighed some 240 pounds. McLaughlin asked him what he was doing there and he replied he had been urinating. Meanwhile, upon the approach of the police car the other two men, who were subsequently identified as Cascino and Cirimele, started to walk away, but were halted by Officer Schuler. Upon being questioned Cascino gave the fictitious name Arieta, and both denied having any acquaintanceship whatever with Tartaro. When asked to explain their presence there they stated that Cascino lived in an apartment house across the street on the corner and they were just out for a walk, to smoke a cigarette. Being interrogated further they said they had been drinking and had just come from a dance-hall on Ellis and Fillmore Streets; that they started to walk to the apartment house, across the street, where Cascino lived, but upon reaching the corner Cirimele became sick and stopped to vomit. The three men were asked if they had an automobile and

they stated they had not. All of the foregoing statements were shown to be false. Immediately after taking the men to the police station the officers returned to the scene of the burglary and found a small truck with the lights burning parked at the curb near the side entrance to the grocery store. It belonged to Cascino. And the falseness of the rest of the statements made by Cascino and Cirimele was established at the trial by the testimony of Tartaro, who was the sole witness for the defense, and whose testimony was at variance also with the story he told to the officers on the night of the burglary. He testified he had been friendly with Cascino for upwards of fifteen years and with Cirimele for more than five years; also that Cascino did not live in the vicinity of Fillmore and Jackson Streets at all, but in a distant part of the city, on Polk Street at Broadway. Continuing, he testified that earlier on the night of the alleged burglary he and Cirimele visited Cascino at his home on Polk Street, where they drank some wine and afterwards all three drove to a dance-hall in Cascino's truck, where they consumed more liquor; that shortly after midnight they left the dance-hall to go home in Cascino's truck, but when they reached the corner of Fillmore and Jackson Streets Cirimele got sick; that Cascino stopped the truck and let Cirimele out; that he got out also, and Cascino drove on a little farther, parked the truck and got out too; that after Cirimele alighted he continued to throw up, some of the vomit getting on his, Tartaro's, trousers; that just as they were about to return to the truck he, Tartaro, stepped in toward the side door of the grocery store to wipe off his pants and to urinate, and that as he was walking away from the doorway he was accosted by the police. The statements made by Tartaro on the witness-stand and by his companions on the night of their arrest as to Cirimele's intoxication and vomiting were shown to be false, however, by the testimony of the police officers. They stated that soon after they apprehended the men they smelled Cirimele's breath and could detect no odor of liquor; and that while they found a few wine stains on Cirimele's trousers, they saw no evidence of vomit on his clothing, on the clothing of the other men, at the scene of the crime, nor in the truck. The foregoing facts and circumstances are legally sufficient in our opinion to support the conclusion drawn by the jury

therefrom that a burglary was committed and that appellants were guilty thereof.

■ Appellants argue that the evidence fails to prove either an entry or an intent to steal, both of which are essential elements of burglary. This argument is based upon the claim that Tartaro was seen only "coming away" from the side door of the store, and upon the testimony of the proprietor of the store that so far as he could observe none of the goods in the store had been removed. The police officer insisted, however, both on direct and cross-examination, that he saw Tartaro "coming out" of the doorway, and not "away from" it as counsel for appellants attempted to have him say; therefore, in view of the broken condition of the door, and the admitted fact that Tartaro was in no way connected with the operation of the store, the jury was justified in concluding that after breaking in the door he entered the store with burglarious intent, but that before any goods could be removed therefrom the criminal enterprise was interrupted by the unexpected arrival of the police.

■ Nor do we find any ground for reversal in the giving or refusal to give any of the instructions. Those proposed by appellants to the effect that before appellants could be found guilty the prosecution was required to prove that "a crime was actually committed"; that appellants "did something more than give evidence of a mere intention to commit a crime"; and that the facts must do more than to "arouse suspicion of guilt, no matter how grave that suspicion might be", were in substance covered by the court's charge to the jury. In this respect the court read to the jury the charging part of the information; also the code section defining burglary and the degrees thereof; it then instructed that, appellants having pleaded not guilty to the charge, it was the duty of the People to prove to the jury's "satisfaction, beyond all reasonable doubt, and to a moral certainty, the truth of each and every one of those allegations" of the information; also that in every crime or public offense there must exist a union or joint operation of act and intent, and that the intention is manifested by the circumstances connected with the offense, etc. Continuing, the court instructed upon the doctrines of presumption of innocence and reasonable doubt, in the exact language of

section 1096 of the Penal Code, which was sufficient without giving any further instructions on those doctrines. (Pen. Code, sec. 1096a.)

■ An analysis of appellants' proposed instruction embodied in their fifth assignment of error shows that the instruction was loosely drawn and consequently confusing in effect. Upon that ground alone the court was justified in refusing to give it. Apparently the intention was to have the jury informed thereby that the evidence adduced must show beyond a reasonable doubt the existence of every element necessary to constitute such crime before the question of appellants' guilt thereof could be considered. But as pointed out, the court had already instructed the jury as to the degree of proof essential to establish every allegation contained in the information; and obviously the remainder of the requested instruction embraced merely a self-evident proposition and not a principle of law, namely, that appellants could not be found guilty of a crime, the existence of which the prosecution failed legally to establish. Therefore, even though an instruction to that effect, properly drawn, were presented, there would have been no prejudicial effect in refusing to give it.

■ Of its own motion the court gave the following instruction: ''A defendant, in a criminal action or proceeding, cannot be compelled to be a witness against himself, but if he offers himself as a witness, he may be cross-examined by counsel for the People, as to all matters about which he was examined in chief. The neglect or refusal of a defendant to be a witness, cannot in any manner prejudice him, nor be used against him on the trial or proceedings.

''Further, in this connection, I will instruct you that a defendant, under the laws of the State of California, has a right to take the witness stand in his own behalf, and one of the defendants in this case did that; and it is your duty to carefully weigh and consider his testimony, as you would consider and weigh the testimony of any other witness who has appeared before you. You should not reject or disregard his testimony, merely because he is a defendant in the case, but you should apply to his testimony the same rules in determining the credence to which the same is entitled as

you would apply to any other witness in the case." (Paragraphing ours.)

The first paragraph thereof is in the exact wording of section 1323 of the Penal Code, and appellants assign the giving of that portion as error, citing the case of *People* v. *Emmons,* 13 Cal. App. 487 [110 Pac. 151]. If, as in the Emmons case, there had been but one defendant on trial here, and as in that case also he had not offered himself as a witness, the portion of the instruction complained of, standing alone, would doubtless be subject to the criticism directed against it in that case. But the situation here is quite different. Three defendants were on trial for the same offense, one of whom voluntarily became a witness for the defense; and when the entire instruction here given is read, it will be seen that the second clause of the first paragraph thereof, which was the subject of criticism in the Emmons case, was intended to and did refer only to the defendant who did so testify and not to those who did not. Consequently the criticism relied upon in the Emmons case is not applicable here.

The court also gave an instruction in the language of section 31 of the Penal Code, defining principals in the commission of a crime, and then amplified the same by stating the meaning of the word "abet" as used in said definition. The entire instruction was in the exact wording of the one considered and approved in *People* v. *Matezuski,* 11 Cal. App. 465 [105 Pac. 425], except that in the present case, evidently through inadvertence and typographical error, the word "permit" was used instead of the word "promote". The evidence as a whole is sufficient, however, to sustain the inference that Cascino and Cirimele knowingly and with criminal intent, by act and counsel, aided and encouraged Tartaro in the commission of the offense; and that being so it cannot be said that the inadvertent use of the word "permit" in said instruction misled the jury, if in fact it was noticeable at all.

Complaint is made also of the giving of certain instructions defining first degree burglary, and in submitting to the jury, along with other forms of verdicts, one covering first degree burglary. It is true, the evidence introduced would not have supported such a verdict if rendered. But it cannot be held that appellants suffered any prejudice as

the result of giving said instructions because they were found guilty only of second degree burglary, and the evidence is legally sufficient to support such a verdict.

The judgment of conviction and the order denying a new trial are affirmed.

Cashin, J., and Jamison, J., *pro tem.*, concurred.