## 14088

### GREEN v. GREENVILLE COUNTY

(180 S. E., 471)

*Mr. H. K. Townes,* for appellant,

*Messrs. W. E. Brown* and *Joseph A. Tolbert,* for respondent,

June 11, 1935.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The presiding Judge, Hon. Wm. H. Grimball, directed a verdict for the plaintiff in this action against Greenville County in the sum of $2,000.00. The action was instituted to recover exemplary damages in the sum of $5,000.00 for the alleged lynching of the plaintiff's intestate, George Green, on November 16, 1933. The appeal questions the correctness of that ruling, and the issue for us to decide is, Did the trial Judge err in directing a verdict for the plaintiff?

The action was brought under Article 6, Section 6, of the Constitution of 1895, and under the statute enacted in conformity therewith (Section 3041, Vol. 2, S. C. Code 1932), which provides as follows: "In all cases of lynching when death ensues the county where such lynching takes place shall, without regard to the conduct of the officers, be liable in exemplary damages of not less than two thousand dollars, to be recovered by action instituted in any Court of competent jurisdiction by the legal representatives of the person lynched, and they are hereby authorized to institute such action for the recovery of such exemplary damages," etc.

Before discussing the evidence adduced at the trial in this case, we refer to a prior decision of this Court in which the term "lynching" was defined, to which definition we adhere..

In the case of *Kirkland v. Allendale County,* 128 S. C., 541, 123 S. E., 648, 650, the following definition was approved and adopted:

"It has been said that the word 'lynching' has 'no technical legal meaning,' but is merely a descriptive phrase which 'is universally understood to signify the illegal infliction of punishment by a combination of persons for an alleged crime.' *State v. Lewis,* 142 N. C., 626, 55 S. E., 600, 610,

611, 7 L. R. A. (N. S.), 669, 9 Ann. Cas., 604. It has been defined by a legal lexicographer as:

" 'A term descriptive of the action of unofficial persons, organized bands, or mobs, who seize persons charged with or suspected of crimes, or take them out of the custody of the law, and inflict summary punishment on them, without legal trial, and without warrant or authority of law.' Black's Law Dictionary, page 737."

It appears from the testimony that George Green, the person alleged to have been lynched, was not in the custody of any law officer, nor was he a prisoner at the time he was killed. This Court held in the case of *Brown v. Orangeburg County,* 55 S. C., 45, 32 S. E., 764, 44 L. R. A., 734, that a county is liable in damages to the personal representatives of a person lynched within her borders by a mob, whether such person be at the time a prisoner or not. Therefore, this question, under the facts, is not before us.

The contention made by the defendant-appellant in the trial in the Court below, and now properly before us on appeal is, that his Honor, the Circuit Judge, erred in not submitting the case to the jury under proper instructions as to what constitutes a "lynching," and what is necessary to be proved in order to sustain such allegation, the contention being that the testimony was susceptible of two inferences, (1) Was George Green killed by a mob by reason of his having been charged with or suspected of some crime? or (2) Was he killed on account of the bitter feeling aroused against him growing out of his refusal to vacate the premises occupied by him but owned by one Mr. James?

Under the holding of this Court it was a matter of vital importance to the plaintiff, in order to establish her cause of action, that she prove that at the time her husband was killed he was charged with or suspected of having committed some crime, and that death was inflicted upon him by the mob because of said crime or

suspicion of crime. In other words, the burden was upon her to prove by the preponderance of the evidence that he was "lynched" as herein defined.

A brief review of the testimony is now in order.

Other than the physician, who testified to the bullet wound which caused the death of George Green, there were no witnesses for the plaintiff except herself. She testified that she and her husband, George Green, lived at or near Taylors, in Greenville County, and that on the night of November 16, 1933, a white-robed body of men, masked and hooded, came to their house, broke the latch on the front door and the back door, entered therein cursing, and that "some of them said they come after him (George Green) for selling liquor." Within a few moments after this occurred, George Green was shot to death, without the slightest legal provocation or justification so far as the testimony shows.

The plaintiff admitted on the trial below that shortly after the killing of George Green she testified at the coroner's inquest, but said nothing in her testimony about any member of the mob mentioning liquor prior to or at the time of the killing. She also admitted that later on she testified in the Court of General Sessions for Greenville County, when certain parties were then and there on trial, charged with the murder with her husband, and that in her testimony on that trial she "didn't open her (your) mouth about liquor."

It is admitted, and was developed in the testimony of Mary Green, that her husband had been a tenant on the farm of Mr. James in Greenville County, and that a very serious dispute had arisen between them over the possession of the house which George Green and his wife, Mary Green, occupied; and that bitter feeling had been aroused against him by Mr. James because of Green's refusal to vacate the premises, and that at the time of the trial of the case at bar a cause was then pending in the Court of Common Pleas for Greenville County, brought by Mary Green against

the estate of Mr. James, who apparently had died in the meantime, seeking the recovery of damages in the sum of $15,000.00, it being alleged in her complaint as the basis of her cause of action that Mr. James, in the effort to dispossess George Green, had inspired the attack upon him by the masked mob, which resulted in the death of Green. A portion of her testimony follows:

"Q. And that is what you sued on when you brought your suit? A. Yes, sir.

"Q. And now you say that even though you didn't tell before the Coroner's jury and this other jury here in a full investigation, yet you come up here today and you thought something was said about liquor; that is true, is it; now, who was it suggested to you first that you say something about liquor, bring liquor into it? A. I just told the truth; they said more than I said they said, for I was just scared to death."

Again on cross-examination by Mr. Townes:

"Q. You admit all that, and you admit when the case was tried here prosecuting men for killing your husband that you didn't mention about anything being said about liquor, you admit that, don't you? A. Yes, sir.

"Q. In the former trial, yes, you do; and now you come into Court and you say you think something was said about it; that is your testimony? A. I don't know who it was, but I heard it.

"Q. Well, now, there was a lot of confusion there that night, was there not, confusion, noise, fuss, cursing? A. Yes, sir, there was a lot of fuss.

"Q. And now it occurs to you that maybe they said something about liquor; that is correct, is it? A. Yes, sir, they was somebody said something about liquor; you know I don't know who they was."

And she further testified:

"Q. Now, Mary, there was not any warrant out for your husband at all, no warrant out for him? A. No, sir.

"Q. Nobody had him arrested; and nobody you ever heard of accused him of anything? A. No, sir.

"Q. And even Mrs. James had not accused him of violating any law at all, had he, the man you sued? A. No, sir, not as I know of.

"Q. And the only trouble between him and Mr. James was, he didn't get out of the house? A. He didn't get out of the house soon enough.

"Q. And you sued Mr. James because, you said, when he would not get out of the house he sent a crowd there to scare him and finally murdered him; that is the reason you sued him? A. Well, he told us to quit picking cotton and get out of the house and George told him he was not done gathering and he would move quick as he could.

"Q. All right, then you sued Mr. James after it happened for sending somebody down there to put him out; that is right? A. Yes, sir."

The plaintiff explained her failure to make any reference to liquor in her testimony at the coroner's inquest and at the trial in the Court of General Sessions by stating that neither at the inquest nor at the trial had any one asked her anything about liquor.

Mr. J. H. Wood, on behalf of the defendant, testified that he was the magistrate at Taylors, knew George Green, the deceased, knew of no charge against him, nor heard any suspicion expressed about his selling liquor in the community; that he had known "old George" for fifteen or twenty years, and had never heard of his ever having drunk whisky; he knew of the trouble that had arisen between George Green and Mr. James, because he as a magistrate took charge of the share crop and gathered it for them; that Mr. James wanted him to put George out of the house, but that he advised him that under the law George would have the right to stay in possession of the premises until the first of the year; and that Mr. James said that if the law could not put him out he would have him put out himself.

This witness further testified that George Green was a good old man and that he was working for him at the time he was killed.

Mr. Monk, a witness for the defense, testified that he lived at Taylors, had been a member of the Ku Klux Klan, and conveyed a message to the Klan from Mr. James with reference to Green's being moved out of the house, and further that there was a great deal of feeling and bitterness with reference to George Green's continuing to occupy the house of Mr. James. This witness stated that he did not know what action the Klan took after receiving the message from Mr. James, and that he never heard of George Green's ever having been accused of any crime.

We have reviewed the testimony at some length for the purpose of showing that more than one reasonable inference might be drawn therefrom.

A careful reading of the testimony of the plaintiff shows that it does not contain any positive contradiction within itself, nor is her testimony contradicted by any of the witnesses who testified for the defendant. But even so, this would not necessarily render her testimony indisputable or place the stamp of verity upon it. The truth or falsity of her statements, together with the legitimate and reasonable inferences to be drawn from all of the evidence, should have been submitted to the jury.

The general rule is aptly expressed in 26 R. C. L., at page 1069: "* * * The fact that evidence is not contradicted by direct evidence does not render it undisputed, as there still remains the question of its inherent probability and the credibility of the witness or his interest in the result. To justify a Court in instructing a jury that a witness has told the truth, and in directing a verdict based on the truthfulness of his evidence, there must be nothing in the circumstances or surroundings tending to impeach the witness or to throw discredit on his statements. If there is

anything tending to create distrust in his truthfulness, the question must be left to the jury."

Likewise in 64 Corpus Juris 345, we find the following text to the same point: "However, it is not in every case where the evidence upon a particular issue is uncontradicted, even when sufficient to establish the ultimate facts sought to be proved, that the trial Judge can treat the question as one of law and take the issue from the jury. Whether or not this can be done depends on the character of the evidence offered and its relation to the ultimate facts in issue."

In the case of *Chartrand v. Southern Railway,* 85 S. C., 479, page 483, 67 S. E., 741, 743, the Court said: "While the testimony of defendant's warehouse foreman as to the delivery of the goods to Gibboney & Co., and their agency for the Manson Steamship line was uncontradicted, still the Court could not assume that it was true. The truth or falsity of testimony and the sufficiency of it to establish facts in issue are questions for the jury."

In *Ingram v. Davis,* 131 S. C., 326, 125 S. E., 920, 921, which was an action to recover the value of a mule, the presiding Judge directed a verdict for the defendant. Reversing the judgment of the lower Court, this Court said: "Even if defendant's evidence were not contradicted by other direct evidence, such lack of contradiction would not render it undisputed; and where the right to a jury trial is accorded by law, the function and duty of passing upon the credibility of witnesses and the accuracy of their testimony may very rarely be taken from the jury. 26 R. C. L., 1069, § 75. Conceding that cases might arise wherein the Court could properly base the direction of a verdict on the truthfulness of certain evidence which in contemplation of law stood disputed by the adverse party (*Baker v. Telegraph Co.,* 87 S. C., 174, 69 S. E., 151), this, we think, is not such a case. In order to accept as established the defense that the mule here involved had never come into defendant's possession, it was necessary to accept as true and correct the

testimony of one or more of defendant's employee witnesses. What was said by the Court in discussing the testimony of the locomotive engineer in *McLeod v. Railroad Co.* [93 S. C., 71, 76 S. E., 19, 705], *supra,* is more or less applicable here. The credibility of these witnesses, the inherent probability of their statements, the extent to which the accuracy of such statements may have been affected by the bias or interest of the witnesses, etc., were all considerations peculiarly within the province of the jury. * * * Neither the truthfulness nor the infallibility of defendant's witnesses was admitted. We perceive nothing in the state of facts presented which would warrant the Court in holding, either that the jury did not have the right to judge of the credibility of defendant's witnesses and of the weight of their testimony, or that there was no necessity or occasion for the exercise of that right," citing numerous cases.

See, also, *Anderson v. H. & B. R. & L. Co.,* 134 S. C., 185, 132 S. E., 47; *Richardson v. N. W. Railroad Co.,* 124 S. C., 314, 326, 117 S. E., 510; *Crews v. Sweet,* 118 S. E., 613, 125 S. C., 303, 306, 29 A. L. R., 43; *Campbell v. Life & Cas. Ins. Co.,* 155 S. C., 63, 152 S. E., 18; *Taylor v. Winnsboro Mills,* 146 S. C., 28, 143 S. E., 474.

The Court has held in cases too numerous to cite that when a motion for a directed verdict is made, the evidence in the cause must be considered most favorably to the party opposing it, in determining whether the directed verdict should be granted.

In our view, the testimony in this case, which we have carefully considered, controlled, and governed by the principles of law above referred to, is clearly susceptible of more than one reasonable inference. It was peculiarly the province of the jury under the facts of this case to pass upon the credibility of the statements testified to by the plaintiff, who was an interested witness, and directly affected by the result of the trial. We, of course, are not to be understood as expressing or indicating our opinion

as to the weight of the evidence for or against either of the parties.

For the error indicated, it is the judgment of this Court that the judgment of the Court below be, and the same is, hereby reversed, and the case remanded for a new trial.

Mr. Chief Justice Stabler, and Messrs. Justices Carter, Bonham, and Baker, concur.