[Crim. No. 4317. Fourth Dist., Div. Two. Aug. 20, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
REGINALD JONES, Defendant and Appellant.

438

**COUNSEL**

Christopher Hall, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Larry C. King, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KERRIGAN, Acting P. J.**—Charged with rescuing a prisoner from lawful custody (Pen. Code, § 4550), lynching (Pen. Code, § 405a), incitement to riot (Pen. Code, § 404.6), and two prior felony convictions, defendant's motion to set aside the information was denied. One prior conviction was stricken and one admitted. Tried by jury, he was found guilty of lynching and incitement to riot, but acquitted of the prisoner rescue charge. Defendant was sentenced to state prison, the sentence was suspended and he was placed on probation on condition that he serve weekends in the county jail for a period of one year. He appeals from the judgment of conviction.[1]

About 9:30 p.m. on June 30, 1969, two Santa Ana police officers on routine car patrol observed Mercy Roaches Sandoval, age 18, throwing bottles in the street near a take-out restaurant establishment. The officers pulled into the restaurant, called for backup units, left their vehicle, and approached Sandoval. The defendant, Jones, was noted standing at the order window at that time. Sandoval, standing amidst broken glass, had slurred speech and was placed under arrest for being drunk in public. He staggered while being escorted to the patrol unit.

Defendant approached the arresting officer and asked him what he was doing. When told that Sandoval had been placed under arrest,

---

[1]The appeal is properly from the judgment of conviction due to the manner in which sentence was imposed. (See Witkin, Cal. Criminal Procedure (1963) Appeal § 648, p. 641.)

defendant shouted, "No, you're not. We talked to your Chief, and you pigs are supposed to stay off the lot (restaurant premises). We'll handle our own problems." Defendant jumped on a bench located in the restaurant patio. With arms upraised and gesturing towards the patrol car, he yelled, "Don't let them take him away"; "Let's get 'em"; "Don't let the fucking pigs take him away." His exhortations and obscenities were directed to a gathering crowd of some 50 people. The officers and patrol car soon became the target of bottles and debris.

With Sandoval in the back seat, the officers attempted to leave, but were prevented from doing so by a car which blocked the driveway. As they attempted to back away from the roadblock, defendant opened the rear door of the patrol car, partially entered, and pulled out Sandoval. Defendant was assisted by an unidentified male in a yellow jacket. Together they supported Sandoval and dragged him into the crowd.

There was no pursuit since by then the crowd had converged on the patrol car, and the officers were still under bombardment. They hurriedly left the scene.

Defendant had been recognized by one of the officers, and he was arrested the following day at his place of business.

On July 9, 1969, defendant was still in custody in the Orange County jail. He attempted to bring a writing tablet with him to the visiting area in contravention of jail rules and regulations. When informed of the rule, defendant placed the tablet in an unlocked mailbox outside the tank area. The deputy who had called the rule to defendant's attention went to the mailbox and removed the tablet. Upon examination, two notes were discovered and removed by the sheriff. The remainder of the tablet was returned to defendant. The two notes were introduced at trial.

On that same date, Sandoval was also in the Orange County jail. He had been arrested for another occurrence of being drunk in public. The arresting officer was the same as on June 30, but he could not then or at trial identify Sandoval as the escapee.

Defendant testified in his own behalf to the effect that he witnessed the escape but did not participate in it; he remained at the order window throughout and did not harangue the crowd. Several witnesses corroborated his testimony, including Sandoval, who admitted being the escapee. Sandoval maintained that he was assisted out of the police vehicle by a fellow Mexican, not the defendant.

On appeal, defendant raises the following issues: (1) The lynching statute (Pen. Code, § 405a) is unconstitutionally vague and uncertain;

(2) the trial court erred in not instructing the jury *sua sponte* on the elements of lynching and incitement to riot; and (3) the confiscated letters were improperly admitted into evidence.

Defendant initially contends that section 405a of the Penal Code is unconstitutionally vague and uncertain. He bases his argument on several different premises. Primarily, defendant relies on the difference between the statutory and dictionary definitions of the term "lynching." In addition, defendant argues that there are no reported cases under the section, but there is authority to the effect that the statute was designed as an anti-discrimination measure. Finally, he contends that the later enactment of the "rescue" statute evinces a clear indication that the Legislature did not intend for section 405a to apply to situations such as the instant case, wherein there was no harm to the prisoner.

Section 405a, entitled, "Lynching: definition," provides: "The taking by means of a riot of any person from the lawful custody of any peace officer is a lynching."[2]

The primary thrust of defendant's attack on the statute is directed to the absence of the element of harm or intent to harm the prisoner, and the variance between the statutory and dictionary definitions of "lynching."

The origin of the term apparently was taken from the actions of one "Lynch" who was a judicial officer in Pottsylvania, Virginia, during the Revolutionary War; felonies were to be tried in Williamsburg, some 200 miles away; due to the distance, the appearance of witnesses was uncertain, and there was great difficulty in transporting the accused; British presence in the area made court sessions erratic; consequently, Lynch began to administer justice from Pottsylvania; the change of forum was against the law, but justified. (See *State* v. *Aler,* 39 W.Va. 549 [20 S.E. 585, 588].)

"Lynching" came to mean the situation wherein a group of persons usurps ordinary government powers and exercises correctional authority over others. (*Zmunt* v. *Lexa,* 37 Ohio App. 479 [175 N.E. 458, 460].) The word generally includes the infliction of summary punishment without benefit of trial or authority of law (*Green* v. *Greenville County,* 176 S.C. 433 [180 S.E. 471]), and has also been popularly regarded as "mob vengeance on persons suspected of crime." (*Barnes* v. *City of Chicago,* 237 Ill.App. 464.)

Defendant argues that the section has been construed only as an antidiscrimination device (see 26 Ops. Cal. Atty.Gen. 213; 32 Ops. Cal. Atty.Gen.

---

[2]Statutes 1933, chapter 401, section 1, page 1026.

267; see also Klein, *The California Equal Rights Statutes in Practice*, 10 Stan.L.Rev. 253, 259), and has never been the subject of a reported appellate decision. He argues from the foregoing, that the application of the statute to the facts of this case conflicts with a reasonable interpretation of the acts to which the statute should apply. Defendant claims the lack of reported cases means that prosecutors have heretofore confined themselves to "the rare true lynching case."

■ A statute which forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. (*Connally* v. *General Const. Co.*, 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; *In re Newbern*, 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116]; see *People* v. *Belous*, 71 Cal.2d 954, 960 [80 Cal.Rptr. 354, 458 P.2d 194]; see also *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618].) A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the proscribed conduct. (*Rowan* v. *United States Post Office Department*, 397 U.S. 728, 740 [25 L.Ed.2d 736, 745, 90 S.Ct. 1484]; see *Bouie* v. *City of Columbia*, 378 U.S. 347, 351 [12 L.Ed.2d 894, 898-899, 84 S.Ct. 1697].)

■ The case at bar presents no vagueness problem. Defendant's quarrel is that the Legislature chose to define a word in terms other than its traditional definition. A similar argument was rejected in *People* v. *Knowles*, 35 Cal.2d 175 [217 P.2d 1], in which defendant contended that a 1933 amendment to section 209 of the Penal Code, which eliminated the requirement of asportation in kidnaping and allowed defendant to be among the first convicted of kidnaping for the purpose of robbery by merely confining his victim in the course of an armed robbery, was intended to "apply only to acts of seizure and confinement incident to a 'traditional act of kidnapping,'" and was void for vagueness. (*People* v. *Knowles, supra*, 35 Cal.2d 175, 181.) The court held that the statutory definition was not rendered uncertain or ambiguous because some of the prohibited acts were not ordinarily regarded as kidnaping, since the Legislature may define and punish offenses as it sees fit, subject, of course, to the prohibition against cruel and unusual punishment. (*Ibid.*)

■ Broadly speaking, crimes in the United States are what the laws of the individual states make them, subject to the prohibition against bills of attainder, ex post facto laws, and the restrictions imposed by the Thirteenth and Fourteenth Amendments. (*Rochin* v. *California*, 342 U.S. 165, 168 [96 L.Ed. 183, 187-188, 72 S.Ct. 205, 25 A.L.R.2d 1396].)

■ The statute is clear on its face, and defendant was placed on notice

that the removal of a person from the lawful custody of a peace officer by means of riot was prohibited, no matter what consequences inured to the person so removed.

The last aspect of defendant's argument is that section 405a of the Penal Code must include the element of harm to be consistent with the historical definition since the Legislature enacted a broad "rescue" statute (see Pen. Code, § 4550)[3] in 1941 and, therefore, incidents such as occurred herein were never meant to be governed by the lynching law.

Although the Attorney General concedes that the rescue statute was subsequent legislation, the present version of that section is derived from Crimes and Punishment Act sections 93, 94 (Stats. 1850, ch. 99, §§ 93, 94, pp. 240-241), adopted as section 101 of the Penal Code in 1872, There is no difference between the 1872 and 1941 enactments.[4]

Where provisions of the Penal Code are substantially identical with corresponding provisions in prior statutes, they must be construed as a continuation of the latter, not as new enactments. (See Pen. Code, § 5.) Consequently, no special significance is to be attributed to the 1941 re-enactment of the rescue law.

Nor does the existence of two statutes dealing with similar subjects present any difficulty. The Legislature is not required to legislate on all aspects of a problem at the same time. (See *People* v. *International Steel Corp.*, 102 Cal.App.2d Supp. 935, 941 [226 P.2d 587]; see also *Whitney* v. *California*, 274 U.S. 357, 370 [71 L.Ed. 1095, 1103-1104, 47 S.Ct. 641].)

Moreover, there is no difficulty in following the mandate that statutes must be construed harmoniously. (See *People* v. *Trieber*, 28 Cal.2d 657, 661 [171 P.2d 1].) It was not arbitrary, capricious or unreasonable of the Legislature to enact section 405a of the Penal Code to deal with a special aspect of a general problem. (See *People* v. *Beachem*, 223 Cal. App.2d 383, 387-388 [35 Cal.Rptr. 673].) Although both sections deal with the taking of persons from lawful custody, the anti-lynch law concerns only the taking by means of riot, which presents greater danger to the officers and populace than a single act of only a few disciplined persons.

---

[3]Section 4550 prohibits ". . . [R]escues or attempts to rescue . . . any prisoner . . . from any . . . officer or person having him in lawful custody. . . ." "Rescue" has been distinguished from escape by the fact that in the former, there is no effort on the part of the person in custody. (See *People* v. *Murphy*, 130 Cal.App. 408, 409 [20 P.2d 63].)

[4]The statute was later amended by Statutes 1949, chapter 1019, section 1, page 1882 to read in its present form.

Section 405b, which provides greater punishment for lynching than for a violation of the rescue section, supports this analysis.

■■ Defendant next maintains that the court erred in not rendering *sua sponte* instructions on the elements of the lynching law. Specifically, defendant contends that the terms "acting together" and "lawful custody" used in instructions pertaining to the lynching charge should have been defined, and the jury should also have been instructed on the subject of Sandoval's offense, "drunk in public" (Pen. Code, § 647, subd. (f)), since it pertained to the subject of lawful custody. Defendant further contends that, with respect to the incitement to riot count, the jury should have been instructed on the meaning of the word "urging" and the phrase "clear and present danger" as employed in the instructions concerning the charge. Stated in another fashion, with the exception of "lawful custody," defendant's argument is that the instructions were inadequate, confusing, or misleading with reference to those specific terms enumerated above.

The record does not indicate that defense counsel submitted any instructions or requested a clarification of the instructions given by the court until after the jury had retired to deliberate. Defense counsel then belatedly raised the issue of "lawful arrest" and the right to resist an unlawful arrest.

The jury was instructed as to the elements of lynching, ". . . the taking by means of a riot from the lawful custody of any peace officer is a felony." (Adapted from Pen. Code, § 405a.) "Riot" as used in the lynching and incitement to riot counts was defined as, ". . . [A]ny use of force or violence, disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law." (Adapted from Pen. Code, § 404.) The jury was also advised that "disturbing the public peace," as used in the definition of riot, means "the malicious and wilful disturbance of the peace and quiet of any neighborhood or person, by loud or unusual noise, or by tumultuous or offensive conduct, or threatening, traducing, quarreling, challenging to fight or fighting, or use of any vulgar, profane or indecent language within the presence or hearing of women or children; in a loud or boisterous manner." (Adapted from Pen. Code, § 415.)

With reference to the incitement to riot count, the jury was also instructed as to the elements of the offense in statutory terms. ". . . [E]very person who with intent to riot does an act or engages in conduct which urges a riot, or urges others to commit act [*sic*] of force or violence, at a time and place and under circumstances which produce a clear and present and immediate danger of acts of force or violence is guilty of a misdemeanor." (Adapted from Pen. Code, § 404.6.) The jury was also informed

that to find a violation of section 404.6, "there must exist in the mind of the perpetrator the specific intent to urge a riot and urge others to commit acts of force or violence, and unless such intent so exists, that crime is not committed."

As a general rule, ordinary words do not require definition; they are presumed to be understood by the jurors. (*People* v. *Chavez,* 37 Cal. 2d 656, 668 [234 P.2d 632]; *People* v. *Hawkins,* 268 Cal.App.2d 99, 106 [73 Cal.Rptr. 748]; *People* v. *Shannon,* 147 Cal.App.2d 300, 305 [305 P.2d 101].) The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction (see *People* v. *Cascino,* 137 Cal.App. 73, 77-78 [29 P.2d 895]), and is ordinarily sufficient when the defendant fails to request further amplification. (*People* v. *Failla,* 64 Cal.2d 560, 565 [51 Cal.Rptr. 103, 414 P.2d 39]; see also *People* v. *Wren,* 271 Cal.App.2d 788, 793 [76 Cal.Rptr. 673].) If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language. (*People* v. *Thomas,* 25 Cal.2d 880, 895 [156 P.2d 7].) Consequently, defendant's argument that further instructions were required to define "acting together" and "urging" is unmeritorious.

Defendant also maintains that the instructions established no standards for determining a "clear and present danger," and hypothesizes a conviction on the basis of mere words, particularly unpopular words, such as "pigs." However, the incitement to riot instruction contained language indicating that not just words, but words, acts and conduct which tended to incite were necessary to justify a conviction. To persons of ordinary understanding, the urging of others to acts of force or violence is neither similar nor comparable to speech which merely stirs to anger, invites public dispute, or brings about a condition of unrest. (*People* v. *Davis,* 68 Cal. 2d 481, 485 [67 Cal.Rptr. 547, 439 P.2d 651].) In addition, the phrase "clear and present danger" is taken from the statute and, as such, is sufficient. (*People* v. *Failla, supra,* 64 Cal.2d 560, 565.) Similarly, extracts from appellate opinions are deemed to be correct statements of the law. (See *People* v. *Odom,* 19 Cal.App.2d 641, 649 [66 P.2d 206].)

In his attack on the instructions pertaining to "lawful custody," and Sandoval's offense, defendant claims *sua sponte* instructions were required, since without any specific advisement, the jury was unable to make any determination on the issue of lawful custody. The issue with regard to this term is whether the law of arrest and elements of section 647, subdivision (f) of the Penal Code were general principles of law governing the case, or were commonly or openly or closely connected with the facts

of the case before the court. (See *People* v. *Hood*, 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].)

The quantum of evidence bearing on the issue of lawful custody was not great, but it was sufficient. An officer testified he saw Sandoval throwing bottles, and that he had slurred speech and an unsteady gait. Sandoval testified that he had only had one can of beer some three and one-half hours before his arrest, but that he was "high" at the time. From this evidence, it cannot be said there was any issue of lawful custody and there was no error in failing to instruct *sua sponte*.

■ Finally, defendant contends that the admission of the notes seized at the jailhouse constituted prejudicial error. The notes were seized after defendant attempted to bring them to the public visiting room with him. The two notes were in different handwritings. Expert testimony established that one memo was written by defendant, but the other was not.

In attacking the admissibility of the documents, defendant alleges an illegal search and seizure and violation of his right of privacy. He also maintains that one memo was irrelevant since it was not authored by him. Finally, he contends that no proper foundation was laid in that the chain of evidence was deficient.

The writing *not* authored by the defendant contained the following message:

"How did you get caught?

"They can't prove that I helped you excape [*sic*] so keep your mouth shut and you don't know who it was. If they ask you about me you don't even know me! You have been in the shop two or three times."

The note *written* by defendant (apparently to Sandoval) reads as follows:

"Read it 2 times then tear it up & flush it.

"How did you get caught? If they ask if you know me, Tell them you don't, you just seen me a cuple [*sic*] of times. Some one told them I helped you get out of the car. Just tell them that it wasn't me. That way they will have to drop the case they have on me. They are holding me on three cases of helping you escape. We will probaly [*sic*] go to court at the same time. If you let them know it wasn't me. you will probally [*sic*] get a 1 year probation I will be back to visit you If you beat me out come back to see me. They know I didn't let you out of the car but just are trying to fuck over me because of the riot and the cock tails. they know those cases won't stick so thurseday [*sic*] they added me helping you to escape to it on 2

different charges. Bringing the people over to stop the car and opening the door to pull you out. That won't work either. I got 6 witnesses that know I didn't. So don't let them trick you into talking. and give you another case. just don't know nuthin [*sic*] about nuthin [*sic*]."

It is well-established that a jail shares none of the privacy of a home, an automobile, an office, or a hotel room. (*Lanza* v. *New York,* 370 U.S. 139, 143 [8 L.Ed.2d 384, 387-388, 82 S.Ct. 1218].) Inmates of prisons do not have the usual array of federal and state constitutional rights guaranteed to non-incarcerated citizens. (*In re Ferguson,* 55 Cal.2d 663, 670-671 [12 Cal.Rptr. 753, 361 P.2d 417].) Except for the attorney's room, a prisoner has no right of privacy in a jail. (*People* v. *Lopez,* 60 Cal. 2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) Consequently, prison authorities may subject inmates to intense surveillance and search unimpeded by Fourth Amendment barriers. (*Lanza* v. *New York, supra.*)

Letters from the Orange County jail are read and censored to prevent any threats emanating from inmates. Prison officials may regulate communications and visitation. (See *Adams* v. *Ellis,* 197 F.2d 483, 485; *People* v. *Boulad,* 235 Cal.App.2d 118, 126 [45 Cal.Rptr. 104].) In the process of censoring mail and regulating communications, officials may intercept letters; the letters so seized are admissible in evidence. (*People* v. *Dinkins,* 242 Cal.App.2d 892, 902-903 [52 Cal.Rptr. 134]; see also *Stroud* v. *United States,* 251 U.S. 15, 21-22 [64 L.Ed. 103, 111, 40 S.Ct. 50].)

The relevancy of the anonymous note may not be disputed. Although expert testimony indicated that it was not authored by defendant, it was observed in his possession, and its contents dealt with the lynching.

Finally, defendant's claim that the letters were admitted without proper foundation is without merit. The deputy who seized the memos testified that they were the ones he took from the tablet defendant placed in the mailbox. While the deputy admitted on cross-examination he did not place any identification marks on the documents and was unable to remember the contents word for word, his positive trial identification of the confiscated writings satisfied the requirements of laying a proper foundation. (See Evid. Code, § 400 et seq.)

The judgment of conviction is affirmed.

Gabbert, J., concurred.